**Certiorari Denied, No. 31,766, July 22, 2009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-094**

**Filing Date:  May 26, 2009**

**Docket No. 28,328**

**STATE OF NEW MEXICO**
**ex rel. CHILDREN, YOUTH**
**AND FAMILIES DEPARTMENT,**

　　　　**Petitioner-Appellee,**

**v.**

**COSME V.,**

　　　　**Respondent-Appellant,**

**and**

**EMMA M. and ORLANDO M.,**

　　　　**Respondents.**

**In the Matter of JOHNNY V. and**
**EVONNE V., Children.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**John J. Romero, District Judge**

Simon Romo, Chief Children's Court Attorney
Daniel J. Pearlman, Children's Court Attorney
Santa Fe, NM

for Appellee

Caren I. Friedman
Santa Fe, NM

for Appellant

Joshua A. Spencer
Albuquerque, NM

Siobhan Nada
Rio Rancho, NM

Guardians ad Litem

**OPINION**

**SUTIN, Judge.**

**{1}** Cosme V. (Father) appeals from an adjudication of neglect with respect to Johnny V. and Evonne V. (the Children). He raises two issues, contending that the district court erred in denying his motion to dismiss and challenging the sufficiency of the evidence to support the adjudication. We held oral argument pursuant to our expedited bench decision program, but removed the case from that program when it was determined that additional time was needed in order to render a reasoned decision. This case was then given the highest priority in order to render a decision at the earliest possible date, pursuant to *In re Court of Appeals Caseload*, No. 1-21, ¶ 6 (filed Oct. 17, 1995), reprinted as Appendix to *State v. Curley*, 1997-NMCA-038, 123 N.M. 295, 939 P.2d 1103. For the reasons that follow, we affirm.

**BACKGROUND**

**{2}** The Children, Youth and Families Department (the Department) has a lengthy history of involvement with the Children prior to the events that led to the Department's neglect/abuse petition. The first referral occurred in mid-2002, when Johnny was about fifteen months old. Due to Emma M.'s (Mother's) stated inability to care for Johnny, the Department investigated alternative custody arrangements. The Department visited the home in which Father and his mother were living, found the home to be appropriate, and released Johnny to reside with Father.

**{3}** The Department received the second referral in April 2003, after the birth of Evonne. During the course of its investigation, the Department discovered that Father had transferred care of Johnny back to Mother and that an open case for child support enforcement was pending against Father. The Department attempted to contact Father without success. During the course of its investigation of Mother, the Department observed that the Children were living in a filthy home without adequate food or clothing, and the Department was informed by Mother's landlord that the family was at risk for eviction. Ultimately, the family was referred to community agencies.

2

**{4}** A year later, in April 2004, the Department received the third referral. Once again, there was no food in Mother's house for the Children, and the Children were inadequately clothed. In addition, the Children had not been kept up-to-date on their shots, resulting in medical neglect. Further, the two adult care givers, Mother and Orlando M. (Stepfather), admitted to smoking marijuana. The Department did speak to Father during the time period associated with this third referral in April 2004. Father stated that he had no concerns regarding the care of the Children.

**{5}** The fourth referral came in November 2005, when Mother gave birth to a drug-exposed child. The Department's investigation also revealed medical concerns with respect to Evonne and the fact that Mother failed to take Evonne to scheduled medical appointments requested by the Department. The Department obtained information regarding the physical location of Father's residence from Mother. At the adjudication hearing, the Department was unable to identify the location provided by Mother because the Department could not remember the address. On December 26-30, 2005, the Department made four attempts to contact Father, visiting the address provided by Mother and leaving a card and a letter. The letter indicated that the Department was in the middle of an investigation involving the Children, that there was a need for his input for possible placement, and that there was a need to talk about the safety of the Children. The Department was unable to make contact with Father and no response was received with regard to the card or letter. The family was referred to the Department's in-home services.

**{6}** On June 7, 2006, the Department received the fifth referral after Mother gave birth to another drug-exposed child. By this time, Mother had given birth to five children. The Department began another welfare check that revealed concerns about inadequate shelter, as well as lack of supervision due to substance abuse by Stepfather.

**{7}** Contemporaneous to the referral in June 2006, Father filed a petition against Mother in district court seeking an order of protection from domestic violence. In the petition, Father alleged that Mother had physically abused Evonne and that Mother had become verbally abusive and threatening to Father when he confronted her. Additionally, Father alleged that Mother had a drug problem to which the Children were exposed. In a subsequent order of dismissal, Father was advised to address the child custody issues in the proper court and to contact the Department if he believed the Children were in danger. Father never made a referral to the Department regarding his belief that the Children were in danger.

**{8}** As a result of these problems, in June 2006, the Department started pushing Mother to convince Father to approach the Department. On June 14, 2006, a Department investigative worker spoke with Father by telephone and inquired whether he could care for the Children. Father indicated that he was not in a position to be able to care for them. Mother and Father had a discussion and together they ultimately agreed that the Children would reside in Albuquerque with a "fictive kin," Joe Ann M. a/k/a Joanna M. (fictive kin). The Department approved the voluntary fictive kin arrangement for the Children.

3

**{9}** Subsequent to the fifth referral, the Department took Mother's three younger children into custody. The Department placed Mother's three younger children with fictive kin. As part of the treatment plan for the three younger children, on February 10, 2007, the Department took the three younger children from fictive kin's home and returned them to Mother's custody for a trial home visit. The Children were also returned to reside in Mother's custody during the trial home visit. Less than two months later on April 4, 2007, the trial home visit was disrupted. Reasons for the disruption included that Mother and Stepfather had stopped submitting to random urinalysis and that they had stopped participating in their treatment plan for the three younger children. The Department learned of an earlier domestic violence incident between Mother and Stepfather. The police intervened and Mother was arrested on an outstanding warrant. The Children, along with Mother's three younger children, went to Espanola with Stepfather. Upon Mother's release from jail, all five children were returned to fictive kin.

**{10}** On April 9, 2007, a team decision making meeting (TDMM) was held at the Department with Mother, Stepfather, and fictive kin regarding the trial home visit being disrupted and the Department's plan for the continued care of the three younger children. At the adjudicatory hearing, the Department social worker stated that she believed the Department had Father's telephone number and that Father was contacted and invited to the TDMM, "because Johnny . . . and Evonne . . . also returned to [fictive kin's] home." Father did not attend the TDMM. At the TDMM, the Department stated that Mother had ceased participating in random urinalysis, counseling, and treatment services. In addition, it came to light that one of the Children alleged that Mother was the perpetrator of the new domestic violence incident. At this meeting, Mother became enraged and stated that she was going to remove the Children from the home of fictive kin and that she was unwilling to renew the power of attorney that she had previously executed to facilitate the voluntary fictive kin arrangement for the Children, who were not in Department custody. Before leaving the TDMM meeting, Mother refused to provide any of Father's contact information to the Department despite the statement made by the fictive kin that Mother was taking the Children to Father's house for weekend visits.

**{11}** After a federal review on May 15, 2007, the Department made the decision to go ahead and file for custody of the Children because Mother's parting statement at the TDMM was that she was going to go get the Children from fictive kin's home. The Department filed the neglect/abuse petition and corresponding affidavit (original petition) against Mother, Stepfather, and Father on May 15, 2007. On May 25, 2007, the Department filed an amended neglect/abuse petition and corresponding amended affidavit (amended petition) against Mother, Stepfather, and Father. Mother and Stepfather entered no contest pleas regarding the allegations in the amended petition. The Children remained with fictive kin until July 10, 2007.

**DISCUSSION**

**Adequacy of the Petition**

**{12}** The factual allegations in the original petition and amended petition only identify the actions of Mother and Stepfather. Father moved to dismiss the petition for failure to state a claim based on the absence of specific allegations of abuse or neglect on his part. *See generally* Rule 10-322(B)(6) NMRA (authorizing the filing of motions to dismiss for failure to state a claim in abuse and neglect proceedings). After hearing argument, the district court denied the motion. Father challenges this ruling on appeal.

**{13}** "We review the denial of a motion to dismiss de novo because such a motion tests the legal sufficiency of the allegations." *Padilla v. Wall Colmonoy Corp.*, 2006-NMCA-137, ¶ 7, 140 N.M. 630, 145 P.3d 110.

> In determining whether a complaint states a claim upon which relief can be granted, we assume as true all facts well pleaded. In addition, a motion to dismiss a complaint is properly granted only when it appears that the plaintiff cannot recover or be entitled to relief under any state of facts provable under the claim. Only when there is a total failure to allege some matter which is essential to the relief sought should such a motion be granted. Moreover, a motion to dismiss for failure to state a claim is granted infrequently.

*Las Luminarias of the N.M. Council of the Blind v. Isengard*, 92 N.M. 297, 299-300, 587 P.2d 444, 446-47 (Ct. App. 1978) (citations omitted).

**{14}** The abuse and neglect petition filed by the Department in this case is in the format approved by the New Mexico Supreme Court. *See* Rule 10-312(A) NMRA ("Petitions or amended petitions alleging abuse or neglect shall be in a form approved by the Supreme Court."); Form 10-454 NMRA. The petition provides that Father is "alleged to have neglected" the Children, as specifically defined in NMSA 1978, Section 32A-4-2(E)(2) (1999). By virtue of this statutory reference, the petition clarifies that the allegation of neglect is based upon the Children's lack of "proper parental care and control or subsistence, education, medical or other care or control necessary for [their] well-being because of the faults or habits of [Father] or the failure or refusal of [Father], when able to do so, to provide them." *Id.* Hence, the nature of the claim is stated under the test in *Las Luminarias*, 92 N.M. at 299-300, 587 P.2d at 446-47.

**{15}** As the factual predicate for the allegation of neglect, the petition describes the history of referrals and departmental involvement from June 2006 forward. Mother's and Stepfather's drug abuse, the unsatisfactory condition of the home in which the Children were living with Mother and Stepfather, and the ensuing voluntary placement with fictive kin are set forth in the petition. Mother's and Stepfather's subsequent failure to participate in the court-ordered treatment plan, Mother's arrest for domestic violence, the family's eviction, and her announcement in April 2007 that she intended to take the Children from their placement with fictive kin are also described in the petition. Additionally, the amended

5

affidavit for ex parte custody order details the Department's history of involvement with the Children from the time of the first referral in 2002 onward.

**{16}**    Although the petition unquestionably focuses on Mother in describing the basis for the allegations of neglect, we nevertheless conclude that the petition adequately states a claim against Father. "Under our rules of notice pleading, it is sufficient that defendants be given only a fair idea of the nature of the claim asserted against them sufficient to apprise them of the general basis of the claim; specific evidentiary detail is not required at this stage of the pleadings." *Petty v. Bank of N.M. Holding Co.*, 109 N.M. 524, 526-27, 787 P.2d 443, 445-46 (1990) (internal quotation marks omitted). A fair reading of the petition reveals that many of the Children's basic needs had not been met throughout the years preceding the fictive kin placement, and in light of the disintegration of that arrangement, the Children were once again lacking adequate supervision and care, as well as a safe and stable home environment. This state of affairs is sufficient to state a claim against Father, in light of Father's continuing legal duty to care for the Children. *See generally State ex rel. Children, Youth & Families Dep't v. Hector C.*, 2008-NMCA-079, ¶ 23, 144 N.M. 222, 185 P.3d 1072 (recognizing a father's "continuing duty to care for the children" and that failure to make arrangements for proper care of the children may support an adjudication of neglect).

**{17}**    In closing, we note that the petition is less than ideally informative because it does not specifically set out Father's actions or failures to act. Nevertheless, we see no basis on which to hold that the court erred in denying Father's motion to dismiss, although we caution that abuse and neglect petitions which fail to inform  respondents of the basis of claims against them can be subject to dismissal. *See generally State ex rel. Children, Youth & Families Dep't v. Kathleen D.C.*, 2007-NMSC-018, ¶ 12, 141 N.M. 535, 157 P.3d 714 (observing that "at a minimum, due process in neglect and abuse proceedings requires timely notice reasonably calculated to inform the person concerning the subject and issues involved in the proceeding" (internal quotation marks and citation omitted)).

**Evidence Implicating Father Was Clear and Convincing**

**{18}**    A neglected child is statutorily defined, in pertinent part, as one

> who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent, guardian or custodian or the failure or refusal of the parent, guardian or custodian, when able to do so, to provide them[.]

NMSA 1978, § 32A-4-2(E)(2) (1999). To find that a child was neglected, "the district court must have been presented with clear and convincing evidence of [a parent's] culpability through intentional or negligent disregard of [the c]hild's well-being and proper needs." *State ex rel. Children, Youth & Families Dep't v. Amanda H.*, 2007-NMCA-029, ¶ 21, 141 N.M. 299, 154 P.3d 674.

6

**{19}** Notwithstanding the foregoing demanding standard of proof, this Court cannot re-weigh the evidence. *State ex rel. Children, Youth & Families Dep't v. Frank G.*, 2005-NMCA-026, ¶ 38, 137 N.M. 137, 108 P.3d 543, *aff'd by In re Pamela A.G.*, 2006-NMSC-019, 139 N.M. 459, 134 P.3d 746. The district court is in a better position to assess the testimony and credibility of witnesses, and "our scope of review is a narrow one." *In re Termination of Parental Rights of Eventyr J.*, 120 N.M. 463, 466, 902 P.2d 1066, 1069 (Ct. App. 1995). We view the evidence in the light most favorable to the district court's decision and to the prevailing party in determining whether a party has met the clear-and-convincing standard. *Frank G.*, 2005-NMCA-026, ¶ 38; *In re Melissa G.*, 2001-NMCA-071, ¶ 12, 130 N.M. 781, 32 P.3d 790. "[W]e indulge all reasonable inferences in support of the [district court's decision] and disregard all inferences or evidence to the contrary." *Melissa G.*, 2001-NMCA-071, ¶ 12; *State ex rel. Dep't of Human Servs. v. Williams*, 108 N.M. 332, 334-35, 772 P.2d 366, 368-69 (Ct. App. 1989).

> Even in a case involving issues that must be established by clear and convincing evidence, it is for the finder of fact, and not for reviewing courts, to weigh conflicting evidence and decide where the truth lies. We defer to the trial court, not because it is convenient, but because the trial court is in a better position than we are to make findings of fact and also because that is one of the responsibilities given to trial courts rather than appellate courts. Our responsibility is to review for reversible error.

*Williams*, 108 N.M. at 335, 772 P.2d at 369 (citation omitted).

**{20}** The district court could determine by clear and convincing evidence that the Children were without proper parental care and control necessary for the Children's well-being because of the faults or habits of both Father and Mother and because of the failure and refusal of both parents, when able to do so, to provide that necessary care and control. The Department appropriately named both parents in the abuse and neglect proceeding even though the facts on which the petition was based focused on the faults or habits of Mother.

**{21}** The district court could reasonably infer and conclude statutory parental neglect implicating Father. Johnny was born in early 2001 and Evonne was born in early 2003. When the Children were very young, their well-being, needs, and proper care were not seen to by Father or Mother. Father knew about Mother's propensities for drug use and domestic violence. Father knew or should have known of the Department's involvement during mid-2002 until the 2007 petition. In August 2002, Mother was referred to the Department for services, and the Department removed Johnny from Mother's custody because he was left without parental supervision. By voluntary placement, Johnny then resided with Father and Father's mother for a time beginning in August 2002, and the Department closed its investigation. In April 2003, the Department learned that Father, without notifying the Department, had returned Johnny to Mother, after which the Department unsuccessfully attempted to contact Father. The Department contacted Father related to the April 2004 referral involving the Children, and Father indicated that he had no concerns regarding the

7

care of the Children. By June 2006, Mother had given birth to three more children, two of whom were drug-exposed, and Father knew or should have known that the Department had taken custody in a formal proceeding of Mother's three children who were younger than Johnny and Evonne. From the foregoing historical circumstances and from his agreement with Mother to have the Children reside with fictive kin, where Mother's three other children had been placed by the Department, Father was aware or should have been aware of Mother's faults, habits, and violent propensities. Further, he was aware or should have been aware that the Children's needs were not being properly met by Mother.

**{22}** In connection with another Department investigation that revealed neglect relating to the Children in November 2005, the Department went to Father's home four times in December 2005, and Father failed to respond to the multiple messages left by the Department that it was attempting to contact him about the Children. Father alleged in a June 2006 court-filed petition that Mother had physically abused Evonne, had verbally abused Father, had threatened Father, and further alleged that Mother had a drug problem to which the Children were exposed. The district court in that domestic relations matter ordered Father to report future concerns regarding abuse to the Department.

**{23}** In July 2006, after Mother had given birth to her second drug-exposed baby, and after receiving another neglect referral for all of the children living with Mother and Stepfather, the Department was successful in contacting Father. When asked by the Department if the Children could live with him, Father said they should live with fictive kin, that "he did not have concerns about where the [C]hildren were living," and that he was not "in a position to be able to care for them."

**{24}** Since Father was still visiting with the Children, Father was likely aware and certainly should have been aware of the two-month trial home visit that occurred during February, March, and early April 2007. Father was invited by the Department to the TDMM which occurred five days after the trial home visit had been disrupted, and all five children had been returned to fictive kin. Father was invited by the Department because the Children had been returned to fictive kin, but Father did not attend the TDMM. Even if Father believed the Children were properly cared for by fictive kin, he had a parental obligation to know and address any concerns the Department may have had with regard to the Children.

**{25}** There exists no evidence that at anytime during 2002 to the 2007 petition Father ever initiated contact with the Department. From the point Father gave Johnny back to Mother in early 2003 to May 2007, Father did not request the Department to have the Children reside with him instead of Mother or others. Instead, Father was satisfied to have the Children live with Mother or in a voluntary residency with fictive kin. Furthermore, except for Father's June 2006 domestic violence petition alleging Mother's abuse of Evonne, nothing in the record gives a hint of any particular concern on Father's part relating to the Children—even in connection with his visits with the Children and contact on those occasions with Mother or fictive kin.

**{26}** Father lived with his mother. He was unemployed and his only income consisted of social security disability benefits of $640 a month. He told the Department that the benefits were for a mental health condition. His mother was working full time. In 2003, there was a concern that Father was delinquent with child support. He kept no record of the support payments he claims to have made. Father engaged in only once or twice a month visitation with the Children, and nothing in the record indicates that he made an effort to have the Children live with him.

**{27}** Father appears to have been satisfied that he did not have to take any significant role, much less an active one, in regularly assuring that the Children's "well-being and proper needs" were met. *Amanda H.*, 2007-NMCA-029, ¶ 21. Father did very little to fulfill his parental obligations. As of the 2007 petition, Father knew or should have known from the long history of which he was aware that he and Mother were failing in their parental responsibility, that the Children's well-being and proper needs were not consistently assured, and that the Children did not have a long-term, stable future if the historical circumstances continued.

**Father Should be a Respondent in This Case**

**{28}** This case raises a question as to the extent to which a father with whom his neglected children do not reside can escape the consequence of a neglected-child determination under the foregoing circumstances. *See generally In re Adoption of J.J.B.*, 117 N.M. 31, 38, 868 P.2d 1256, 1263 (Ct. App. 1993) ("Where the parents are separated . . . in order to hold [the f]ather responsible for the neglect of the parent having actual physical custody of the child[ren], [the Department] must establish that [the f]ather knew or should have known of the condition of the child[ren.]"), *aff'd in part, rev'd in part*, 119 N.M. 638, 894 P.2d 994 (1995); *State ex rel. Dep't of Human Servs. v. William M.*, 2007-NMCA-055, ¶ 63, 141 N.M. 765, 161 P.3d 262 (rejecting the father's claim that he was unaware that the mother was an unsuitable caretaker based on evidence of the mother's well-documented history of drug use and repeated neglected-children referrals).

**{29}** There is no dispute that the Children were neglected children. Under the circumstances here, Father as well as Mother should be named, served, and shown to be responsible for that neglected-children status. There is no evidence that Father ever inquired, much less stayed in regular or close contact with the Department with respect to the well-being of the Children in Mother's home. Yet Father certainly had every opportunity to do so. Other than visit the Children off and on and provide some undocumented child support, Father made little effort to carry out his responsibility as a parent to care for the Children. Father could hardly have been oblivious to the history and circumstances created by Mother's abuse and neglect. He cannot claim ignorance of potential problems.

**{30}** The evidence in this case is sufficient to bring Father within a neglected-children determination even if he may not have been specifically and timely apprised that Mother threatened to revoke her power of attorney and to retrieve the Children from fictive kin. We

agree with the district court's view that "it is incumbent on both parents to continue to be parents. Just because a child is not living in your home all the time does not absolve you of the legal responsibility to be vigilant, to be involved and aware of what's taking place with your children." *See State ex rel. Dep't of Human Servs. v. Peterson*, 103 N.M. 617, 622, 711 P.2d 894, 899 (Ct. App. 1985) ("Although the evidence in this case was directed primarily at the mother's neglect after she and the children moved . . ., it is also evidence of past neglect by the father. A father may not delegate parental obligations to the mother and be held harmless when she neglects these obligations." (citation omitted)).

**{31}** We see no reason why both parents in this case should not be respondents and be required to participate in the structured and protective court process involving treatment plans and judicial review looking toward permanency through reunification. We are unable under the circumstances in this case to agree with the view that the only neglect of the Children that is relevant insofar as Father is concerned is that which may have occurred or was learned by the Department precisely on April 4 and perhaps on April 9, 2007—events that Father presumably could not have specifically foreseen. That view, while perhaps technically permissible, mistakenly overlooks Father's long history of knowledge and of what Father should have known, and overlooks Father's complacency and failure to be pro-actively involved.

**{32}** Nor does that view fit within the purpose of the abuse and neglect statutory scheme. In Article 4 (Child Abuse and Neglect) of the Children's Code, the principal focus of an abuse and neglect adjudication is on whether a child is a neglected child. *See, e.g.*, § 32A-4-2(E)(2) (definition of neglected child); NMSA 1978, § 32A-4-20(G) (2005) (stating that after an adjudicatory hearing, the court is to make findings on whether the child is a neglected child); NMSA 1978, § 32A-4-22(B) (2005) (stating that if a child is found to be neglected, the court may enter its judgment to protect the welfare of the child by several different dispositions); § 32A-4-22(C) (stating that if a child is found to be neglected, the court may order the child's parent to cooperate with any treatment plan approved by the court); NMSA 1978, § 32A-4-25.1(B) (2005) (stating that at the conclusion of a permanency hearing, the court shall order a reunification or placement plan for the child). Of course, neglected-child status results from parental failure. And parents are to be given notice, named as parties, and served with the petition, so that they have the opportunity to contest a neglected-child determination, and so that once a neglected-child determination is made, they can have the opportunity to seek reunification or proper placement of the child under court order. *See* § 32A-4-25.1 (relating to permanency hearings).

**{33}** Nevertheless, we see nothing in Article 4 that expressly forbids or should be construed as to preclude naming both parents in a petition as respondents where, as in the present case, neglect occurs over time but it is the custodial parent's latest conduct that triggers an abuse and neglect petition much like the proverbial straw that broke the camel's back. The district court has jurisdiction "over both parents to determine the best interest of the child and to decide all matters incident to the court proceedings." NMSA 1978, § 32A-1-8(C) (2005). It seems entirely appropriate for the Department in the present case

to have made both parents respondents in the proceeding and to seek their active and serious participation in treatment plans and other aspects of the proceedings.

**{34}** We fully understand that there will be circumstances in which responsible parents, whether they live apart or not, may for appropriate reasons have one or more of their young children reside for periods of time with relatives or perhaps even friends. We understand that in such instances there may be no reason for Department intervention. *See generally In re Guardianship of Ashleigh R.*, 2002-NMCA-103, ¶ 20, 132 N.M. 772, 55 P.3d 984 ("Evidence that a parent left a child in the care of others is not necessarily sufficient to establish neglect, as long as the parent continues to insure that the caretaker is properly providing for the children's needs. A contrary rule would have the unfortunate effect of discouraging parents from seeking assistance when they find themselves unable to fully discharge the responsibilities of parenthood." (citation omitted)). However, the present case does not involve such an arrangement. Under certain circumstances, parents cannot demand parental rights without pro-actively fulfilling their obligations as parents to care for their children. Father did not pro-actively fulfill his obligations in this case over a substantial period of time, and there came a point when the Department appropriately intervened, and sought and obtained a neglect adjudication implicating Father. *Cf. Hector C.*, 2008-NMCA-079, ¶ 23 (recognizing a father's "continuing duty to care for the children" and that failure to make arrangements for proper care of the children may support an adjudication of neglect). The neglect determination as to Father was based on clear and convincing evidence and was proper. *See William M.*, 2007-NMCA-055, ¶¶ 61-63 (holding that evidence was clear and convincing to establish neglect where the father was not involved in the children's lives, failed to provide a safe and stable home, left the children's home when they were very young, and failed to provide for the children or protect them from the mother's neglect both prior to and during his incarceration).

**In Regard to the Dissent**

**{35}** We believe that the standard for clear and convincing evidence set out earlier in this opinion and that which is set out in the dissent have been met. Particularly as to the standard relied on by the dissent, we have no doubt that, given the circumstances in this case, along with the purposes of the Children's Code and the abuse and neglect process, the scale tilted in the affirmative in the district court judge's mind and, as the fact finder, the judge was "left with an abiding conviction that the evidence [was] true." *State ex rel. Children Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 7, 137 N.M. 687, 114 P.3d 367 (internal quotation marks and citation omitted).

**{36}** Our view of whether Father was properly implicated in neglect and the view of the dissent reflect a difference in approach in regard to the purposes of the Children's Code and the abuse and neglect process. We think that, under circumstances such as those in this case, both parents should be brought into the neglect adjudication, and clear and convincing evidence exists to permit an adjudication that implicates Father at the neglect-adjudication stage. The dissent sees no circumstance, historical or otherwise, that can properly be

considered on the issue of implication of Father in the neglect and that the focus can only be on the circumstances that immediately surround the event that triggered the neglect petition.

{37} This Court's primary focus, however, must be on the purposes of the Children's Code and the abuse and neglect process and on the abuse and neglect scheme as a whole. The first and foremost purpose of the Children's Code is "to provide for the care, protection and wholesome mental and physical development of children coming within the provisions of the Children's Code and then to preserve the unity of the family whenever possible." NMSA 1978, § 32A-1-3(A) (1999) (amended 2009). "The child's health and safety shall be the paramount concern." *Id.* "[T]he welfare of the children is paramount." *State ex rel. Children, Youth & Families Dep't v. A.H.*, 1997-NMCA-118, ¶ 10, 124 N.M. 244, 947 P.2d 1064. The abuse and neglect statutory scheme purposefully sets out a continuum of processes to preserve the unity of the family where possible, to assure the health and safety of the children, and to engage the parents in those processes.

{38} With the foregoing purposes in mind, the overall legislative intent seems obvious. Parents, both of them, are responsible, and until formally relieved remain responsible, for the well being of their children. If the children are not being properly cared for, the parents will have the opportunity with the Department's assistance to participate through active, meaningful, and cooperative involvement in a formal and structured process with judicial oversight and protection to assure that the children receive proper care.

{39} In keeping with the purposes of the Children's Code and the abuse and neglect process and legislative intent, we see no rational basis or any basis grounded in fairness to a stand-by parent on which to ignore at the neglect-adjudication stage relevant historical circumstances. There exists no New Mexico authority for a stale-evidence rationale relating to neglect determinations. The cases relating to stale evidence involve termination of parental rights, and nothing in those cases indicates that the rulings apply to neglect adjudications or indicates that the Department cannot rely on "old" evidence to prove neglect. *State ex rel. Department of Human Services v. Natural Mother*, 96 N.M. 677, 634 P.2d 699 (Ct. App. 1981), cited in the dissent, can be construed to permit the type of evidence the dissent characterizes as stale. In *Natural Mother*, although evidence offered by the Department of Human Services was not useful in determining the termination issue in December 1980, this Court nevertheless indicated that the "evidence was useful to show conditions during [the] period of time" from June 1977 to the date the district court found that the children were neglected, which was February 1979. 96 N.M. at 679, 634 P.2d at 701.

{40} Furthermore, so-called old evidence can be considered when it is relevant to the termination proceedings. *William M.*, 2007-NMCA-055, ¶¶ 64-65 (determining that there was "a very real relationship between [the father's] past conduct and the current abilities" of the father to parent his children; indicating that the district court properly determined "the likelihood of [the father] being able to parent the [c]hildren in the foreseeable future . . .

12

based on all the evidence placed before it"; and holding that the district court "properly determined that [the father's] past conduct was relevant to his ability to parent the [c]hildren in the foreseeable future" (internal quotation marks and citation omitted)); *State ex rel. Children, Youth & Families Dep't v. Amy B.*, 2003-NMCA-017, ¶¶ 10, 15-18, 133 N.M. 136, 61 P.3d 845 (indicating that the district court would not abuse its discretion on the issue of a parent's prospects for change in the foreseeable future if the court were to consider old evidence that was relevant to the proceedings and that showed "a very real relationship between the past conduct and the current abilities").

**{41}** In the present case, the evidence before the district court was relevant on the issue of Father's faults, habits, and failures relating to the Children's neglected-children status. *See* § 32A-4-2(E)(2) (defining a neglected child as a child "who is without proper parental care . . . because of the faults or habits of the child's parent . . . or the failure or refusal of the parent . . . when able to do so, to provide [the care]"). As a final matter, because the rationale was not raised in the district court or argued on appeal, we question the use of the stale-evidence rationale to justify or support a view that only the events in April 2007 can be considered in the neglect adjudication.

**Additional Concerns**

**{42}** The district court found Father neglected the Children. When the Department filed the amended petition, the evidence revealed that Father was not the biological father of Johnny and the parties do not dispute this fact. Section 32A-4-2(E)(2) states that in order for a child to be determined a "neglected child," the child's "parent, guardian or custodian" must have failed to provide for the child's needs. Father is not Johnny's "parent" because he is not his biological or adoptive parent. *See* NMSA 1978, § 32A-1-4(O) (2005) (stating "parents" include biological or adoptive parents who have a "constitutionally protected liberty interest in the care and custody of the child"). It is undisputed that Father does not have guardianship or custody of Johnny. *See* § 32A-1-4(E), (H) (defining "custodian" and "guardian"). The Department conceded this issue in its brief. We instruct the district court to consider the statutory language during any further proceedings concerning Johnny and Father.

**CONCLUSION**

**{43}** We affirm the district court's judgment of neglected children implicating Father.

**{44}** **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**I CONCUR:**

13

JAMES J. WECHSLER, Judge

TIMOTHY L. GARCIA, Judge (dissenting)

**GARCIA, Judge (concurring in part, dissenting in part).**

**{45}**    I respectfully disagree with the majority and would reverse the neglect determination against Father.

**{46}**    The majority determined that sufficient evidence exists to support a neglect determination against Father by clear and convincing evidence.  For the reasons stated herein, I disagree with this determination.  In addition, the majority determined that the district court properly denied Father's motion to dismiss.  I agree in part with the majority that the petition was sufficient to state a claim against Father pursuant to Rule 10-322(B)(6). I disagree with the majority regarding any other determination or analysis of why Father was a proper respondent in this case.

**{47}**    It is undisputed that the Department's abuse and neglect proceedings against Mother and Stepfather were appropriate and supported by sufficient evidence.  In its argument, however, the majority makes inferences and reaches certain conclusions regarding Father that are not supported by the facts of this case.

**Evidence Against Father Was not Clear and Convincing**

**{48}**    The Department has failed to establish that Father neglected his daughter, Evonne. The majority agrees that the Department must establish Father's neglect by clear and convincing evidence.  Majority Opinion ¶ 18.  In determining whether this burden is met, "[the Department] must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *Shawna C.*, 2005-NMCA-066, ¶ 7 (internal quotation marks and citation omitted).  Father argues that the district court lacked sufficient evidence to find that he neglected Evonne.  The crux of the majority's opinion is that Father complacently sat by for years and did nothing to protect the Children, thus neglecting them.  Majority Opinion ¶¶ 21-24.

**{49}**    Prior to June 2006, some evidence exists that Father had not taken more than his designated and intermittent role in the care of the Children.  The Department was concerned about Father's sporadic communication and interaction with their office.  By June 2006, however, Father was involved in the custody and housing arrangements for the care of the Children.  Father initiated the petition for an order of protection against Mother and was engaged in telephonic communication with the Department.  In addition, Father fully cooperated and agreed with the fictive-kin arrangement that was approved by the Department. From June 2006 through the TDMM on April 9, 2007, there was no evidence

14

that Father was failing in his parental responsibilities, was failing to cooperate with the Department, or was failing to cooperate with the fictive-kin arrangement.

{50}    In February 2007, it was the Department that unilaterally removed all five of the Mother's children, including Evonne, from fictive kin's home and placed them back with Mother for a trial home visit (without any notice to or consent from Father).  The Department failed to produce any evidence that its removal of Evonne from the fictive kin's home in 2007 and returning her  to the abusive home of Mother and Stepfather was appropriate.  But for Mother's newest incident of abuse and neglect arising during the 2007 trial home visit arranged by the Department, everything being done by Father and fictive kin was appropriate for the care of the Children. When Mother unilaterally disrupted the fictive-kin arrangement at the TDMM, the Department never called Father to discuss the situation.

{51}    The majority states that, considering the historical circumstances, the Department did enough in 2007 by calling and inviting Father to attend the TDMM.  Majority Opinion ¶ 24. The purpose of the TDMM was to advise Mother that, as a result of the trial home visit being disrupted, her three youngest children would not be immediately returned to her and would be placed in foster care with fictive kin.  The record does not reflect that the TDMM was called to deal with the custody arrangement for Evonne.  The Department had only taken custody of Mother and Stepfather's three youngest children in June 2006.  Fictive kin was the only person entrusted with the voluntary care of Evonne.  When the trial home visit was disrupted, Evonne was returned to the safety of fictive kin's home prior to the TDMM. Therefore, Evonne's security, custody, and care with fictive kin was back in place  before the date that the TDMM occurred.

{52}    I disagree with the majority's determination that Father had a parental obligation to address the Department's concerns regarding Mother's disruption of the trial home visit when he was invited to attend the TDMM to address Mother's three youngest children in Department custody.  Father had no reason to address any issues regarding Mother's three youngest children at the TDMM.  The TDMM was not initiated to address Evonne or the arrangements for her care with fictive kin.  In reality, the record supports the opposite.  The Department and fictive kin were  surprised by the unilateral announcement at the TDMM that Mother was going to immediately pick up Evonne and Johnny from fictive kin's home. Emergency measures had to be initiated to address this surprise announcement.  Without some hint that the Department was requiring Father to attend the TDMM, the invitation to participate in this meeting cannot be transformed into an act of Father's neglect because the meeting was disrupted by Mother's unexpected rage.  This is not evidence of Father's neglect and was never asserted to be evidence of Father's neglect during the testimony from any of the Department's witnesses at the evidentiary hearing.

{53}    I disagree with the majority that the Department had no obligation to inform Father of the emergency situation created by Mother's enraged conduct at the TDMM before filing a petition asserting that Father was neglecting Evonne.  The Department's failure to contact Father after the TDMM prevented him from pro-actively fulfilling his obligations to make

alternative arrangements for the proper care of his daughter. Mother's unexpected rage at the TDMM is the type of compelling event that would only be sufficient to instantly tilt the scales in the affirmative regarding an allegation of neglect against Mother. This evidence is not sufficient to make such a determination against Father and should not have been used against him without first providing Father with the opportunity to protect his daughter.

**{54}** The majority inappropriately faults Father for allowing the Children to voluntarily reside with fictive kin. Majority Opinion ¶¶ 25, 27. Such a determination is contrary to our established precedent. *See generally Ashleigh R.*, 2002-NMCA-103, ¶ 20 ("Evidence that a parent left a child in the care of others is not necessarily sufficient to establish neglect, as long as the parent continues to insure that the caretaker is properly providing for the children's needs. A contrary rule would have the unfortunate effect of discouraging parents from seeking assistance when they find themselves unable to fully discharge the responsibilities of parenthood." (citation omitted)). The record indicates that the voluntary placement with fictive kin provided a dedicated and comfortable environment for the Children. After placement with fictive kin in 2006, nothing in the record establishes that Father did anything to disrupt or violate the fictive-kin arrangement. The record, including the Department's two petitions filed in May 2007, fails to identify any new action or failure to act by Father in 2007 to establish a basis for neglect against Father. The determination of neglect against Father was based upon the inappropriate actions of Mother, combined with Father's absence from the TDMM and his historical interaction with the Department prior to the fictive-kin arrangement. Majority Opinion ¶¶ 20-23.

**{55}** The majority improperly uses stale evidence against Father to support a neglect determination in 2007. Majority Opinion ¶¶ 21-23. Stale evidence is regularly rejected in proceedings involving termination of parental rights. *State ex rel. Children, Youth & Families Dep't v. Lance K.*, 2009-NMCA-054, ¶ 26, ___ N.M. ___, ___ P.3d ___ (No. 26,632, Feb. 11, 2009) (stating that stale evidence cannot be relied upon by the Department "for the purpose of determining whether those conditions persisted" (internal quotation marks and citation omitted)); *Natural Mother*, 96 N.M. at 679, 634 P.2d at 701. However, so-called old evidence can be considered when it is relevant to the termination proceedings. *See William M.*, 2007-NMCA-055, ¶ 65; *Amy B.*, 2003-NMCA-017, ¶¶ 10, 15-18.

**{56}** The majority's analysis of the stale evidence issue in this case misses the point focused upon in this dissent. Majority Opinion ¶¶ 36, 39-41. I agree with the majority that stale evidence should be relevant in many abuse and neglect cases. Where there are fresh allegations and evidence of abuse or neglect, stale evidence is relevant and appropriately admitted to establish an ongoing history and pattern of abuse or neglect. However, this argument is not appropriate to support the position that stale evidence alone is sufficient to establish a current allegation of abuse or neglect where no fresh evidence of neglect exists against a parent. Under circumstances such as these, the precedent excluding stale evidence should apply and I would extend the stale evidence rule to apply to neglect proceedings under the factual circumstances of this case. *State ex rel. Children, Youth & Families Dep't. v. Maria C.*, 2004-NMCA-083, ¶ 25, 136 N.M. 53, 94 P.3d 796 (recognizing that the process

16

for terminating parental rights is a continuum of proceedings beginning with the filing of the neglect or abuse petition). Otherwise, the Department is entitled to continuously hold any stale evidence over the head of a parent until young children reach the age of majority. Without fresh evidence of abuse or neglect, the Department's use of this stale evidence is unjust. The prejudice placed upon a parent to defend against stale allegations of neglect must be given serious scrutiny.

**{57}** Relying exclusively on stale evidence is improper, especially applied to the facts of the present case. The Department never once, over a period of five years, alleged or hinted that Father had neglected the Children. As late as June 2006, the Department was still attempting to place the Children in the temporary custody of Father. Father's fitness to care for the Children was never questioned by the Department before May 2007. The fictive-kin arrangement had the Department's full approval and would not have been disrupted except for the enraged actions of Mother. The Department was unable to include any specific factual allegation (stale or fresh) regarding Father's actions in either petition filed in May 2007.

**{58}** The majority has determined that there is sufficient evidence to establish that Father committed a recent act of neglect when he failed to attend the TDMM. I disagree with this determination, and the remaining stale evidence should not have been used to establish a current determination of neglect against Father. As a result, the Department did not present clear and convincing evidence of Father's neglect.

**Adequacy of the Department's Petition**

**{59}** I respectfully disagree with several of the reasons stated by the majority regarding why Father should be a respondent in this case. The district court properly denied Father's motion to dismiss pursuant to Rule 10-322(B)(6). Father only raised the defense of "failure to state a claim" in his previous district court response and at his argument at the adjudicatory hearing. Father did not raise any due process or other constitutional challenges to the Department's petition. In addition, Father did not assert that our Supreme Court has required the Department to provide more specific information beyond standard notice pleading on Form 10-454 NMRA. These additional issues were not adequately raised by Father or properly preserved below. The motion was properly dismissed under a failure to state a claim analysis because the incorporation of the unstated language in the referenced statute, Section 32A-4-2(E)(2), provided sufficient information to state a claim under a narrow *Las Luminarias* analysis. *Las Luminarias*, 92 N.M. 297, 587 P.2d 444. Overlapping constitutional and legal issues that Father did not raise in this case should not be addressed on appeal. *See In re John Doe*, 98 N.M. 540, 541, 650 P.2d 824, 825 (1982). If the due process issues had been properly raised and preserved by Father, I would also consider reversing the district court on due process grounds for failure to state any information that adequately informed Father of the claim of neglect against him. *Kathleen D.C.*, 2007-NMSC-018, ¶ 12.

**Whether Father Should be a Respondent in This Case**

**{60}**    The majority justifies its position by stating that, as a practical matter, the Children's Code places a paramount concern that the Department focus upon a child's interest over rights of a non-custodial parent. Majority Opinion ¶¶ 37-38. The majority recognizes the legal and procedural difficulties that arise when the Department proceeds to adjudicate an abuse or neglect determination against only one parent. Majority Opinion ¶¶ 31-33. These problems are further magnified in this case where the neglectful Mother is remarried and has three children with Stepfather. Despite this inconvenience, it would be a miscarriage of justice to allow the Department to include Father in its petition simply to eliminate the procedural difficulties faced by the Department, or as a convenient means to avoid splitting up the five children while this neglectful Mother and Stepfather undergo another round of treatment, counseling, and reunification attempts.

**{61}**    I cannot agree with a policy that justifies including Father as an additional respondent to a neglect proceeding because it will establish a better process for the Department to provide formal assistance, oversight, and protection against the neglectful Mother. Acknowledging Father's custodial rights presented a more complex situation for the Department in structuring a care plan for all five of Mother's children. However, the Department's preferences for a unified supervisory process do not trump a parent's constitutional rights to provide care and make decisions about their children. *See Kathleen D.C.*, 2007-NMSC-018, ¶ 14 ("A parent's interest in maintaining a relationship with his or her child and the government's interest are strong countervailing interests, which are equally significant." (internal quotation marks and citations omitted)); *In re Jane Doe*, 98 N.M. 198, 200, 647 P.2d 400, 402 (1982) ("We begin by emphasizing that parental rights are among the most basic rights of our society and go to the very heart of our social structure." (internal quotation marks and citation omitted)); *Maria C.*, 2004-NMCA-083, ¶ 24 ("A parent's fundamental liberty interest in the care, custody, and management of their children is well established."). While I recognize that the Department is entrusted with protecting the best interests of children, it cannot take lightly its interference with a parent's constitutionally protected rights. Department processing preferences and efficiencies should never be considered as the paramount concern in any determination of whether a parent neglected his or her child.

**{62}**    The majority opinion states that throughout the years Father was complacent and failed to be pro-active in the care of the Children. Majority Opinion ¶¶ 29, 31. I disagree with this factual assessment of Father's involvement to support the Department's decision to include Father as a proper party to these proceedings. Father regularly visited the Children and had them stay with him on weekends. Father testified that he paid child support in cash, and the district court recognized such payments and ordered continuing payments be made for Evonne. Johnny lived with Father for a period of time in 2002-2003. In an effort to protect Evonne in 2006, Father filed a petition for order of protection from domestic abuse against Mother. Recognizing his own limitations in caring for the Children in June 2006, Father agreed to the arrangement for fictive kin to insure that the Children

18

were properly cared for in fictive kin's home. Father's actions constitute more than simple complacency as asserted by the majority. I can only conclude that Father was added to these proceedings in order to eliminate the procedural difficulties confronted by the Department in this case or as a convenient means to avoid splitting up the five children while Mother underwent another round of treatment, counseling, and related efforts toward reunification. Department procedural preferences and efficiencies should never be utilized as the basis for the determination of whether a parent has neglected his or her child.

**{63}** Father's motion to dismiss was properly denied pursuant to Rule 10-322(B)(6), but should not be denied for any of the other reason stated by the majority. For the reasons stated herein, I would reverse the district court's determination and judgment establishing that Father neglected the Children by clear and convincing evidence.

---

**TIMOTHY L. GARCIA, Judge**

**Topic Index for** *State of NM ex rel CYFD v. Cosme V.*, **No. 28,328**

| | |
|---|---|
| **CD** | **CHILDREN** |
| CD-CS | Custody |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CN | Child Abuse and Neglect |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-SE | Substantial or Sufficient Evidence |
| | |
| **EV** | **EVIDENCE** |
| EV-CL | Clear and Convincing Evidence |
| EV-SS | Substantial or Sufficient Evidence |