This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-38614

**STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,**

Petitioner-Appellee,

v.

**HEATHER S.,**

Respondent-Appellant,

and

**JIMMY A. and WESLEY S.,**

Respondents,

**IN THE MATTER OF NOAH S.,**

Child.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
William E. Parnall, District Judge**

Children, Youth & Families Department
Rebecca J. Liggett, Chief Children's Court Attorney
Robert Retherford, Children's Court Attorney
Santa Fe, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Deborah Gray Law, LLC
Deborah Gray
Albuquerque, NM

Guardian Ad Litem

**MEMORANDUM OPINION**

**B. ZAMORA, Judge.**

**{1}**    Heather S. (Mother) appeals the district court's determination that her son, Noah S. (Child), is a "neglected child." *See* NMSA 1978, § 32A-4-2(G)(2) (2018). Mother argues (1) the determination of neglect is not supported by substantial evidence of a clear and convincing nature, and (2) the district court abused its discretion by refusing to allow her counsel to impeach a witness using certain photographs during cross-examination. We affirm.

**BACKGROUND**

**{2}**    This case stems from adjudication of an abuse and neglect petition filed by the Children, Youth, and Families Department (CYFD), against Mother based on the events set forth in further detail below. In September 2018, CYFD investigator, Jane Trujillo, contacted Mother following a domestic violence incident in which Mother alleged that Child's custodian, Jimmy A., choked and hit her. Trujillo told Mother that "it would probably be a good idea to get a restraining order" against him for the protection of her children. Child was not present during the domestic violence incident because Child was in a residential program at the Children's Treatment Center for treatment of his "severe ADHD."

**{3}**    Mother's next contact with CYFD was early in the morning of November 29, 2018, when CYFD investigator Carrie Cleveland responded to a police request that CYFD inspect Mother's home to determine whether it was safe for Child and his two sisters to continue residing there. During the course of her inspection of the home, Cleveland observed that every room contained piles of clothing, trash, and debris, and that there were cockroaches in many of the rooms. In the dining room, one electrical outlet lacked an electrical plate, leaving wires exposed, and a sharp steak knife was on the table with the handle extended over the edge and within the children's reach. Ultimately CYFD and the police concluded that Mother's home was unsafe for Child and his sisters, and CYFD took custody of them.

**{4}**    In December 2018, CYFD filed its abuse and neglect petition alleging that Mother and Jimmy A. had "unresolved domestic violenc[e] issues"; that they "educationally neglected [C]hild"; "caused [C]hild to be medically neglected"; and "allowed [C]hild to live in substandard and hazardous housing." During an adjudicatory hearing spanning over two days, CYFD presented evidence in support of its petition. First, CYFD presented testimony from Cleveland and Trujillo regarding the condition of the home.

Although the reason for Trujillo's initial visit in September 2018 was the alleged domestic violence incident, Trujillo testified that she was concerned about the cleanliness and condition of Mother's home. Trujillo did not notice any obvious safety hazards to the children, but testified there were numerous cars and car parts in the front yard, that the kitchen was "kind of messy" and that the home as a whole was "a little messy." Trujillo explained to Mother, the importance of cleaning the home and yard and Mother agreed to do so.

**{5}** When Cleveland visited the home the night of Child's removal, the home had more significant cleanliness and safety issues. The front yard contained three vehicles parked "haphazardly" among piles of tools, which made entry difficult to navigate and forced Cleveland and one of the police officers to use flashlights to find a safe path to enter the home. Upon entry, Cleveland discerned a faint but "noticeable" odor of urine throughout the home. The home, including the front doorway, was obstructed by piles of clothing, trash, and debris, which made it hard to move through and among its rooms. The kitchen too was unclean: there were dirty dishes on the counter and in the sink, old food in the sink, and more cockroaches. The floor was sticky, discolored, and littered with paper towels. The bathroom floors were also sticky and discolored, the bathroom contained cockroaches, and the bathtub was spotted with black stains. There were piles of clothing in the children's bedrooms, and at least one of the bedrooms contained piles of debris, trash, and cockroaches. These conditions led to Child's removal by CYFD.

**{6}** Mother agreed to clean the interior of the home and to work on making a path permitting safe ingress and egress through the yard. The next day, Trujillo visited Mother's home and discovered Mother had attempted to clean it. The living room was clean and had been vacuumed, but the kitchen still contained dirty dishes and food everywhere. In the children's bedroom was a huge truck tire rim, and the rim cavity was filled with various items.

**{7}** CYFD also presented testimony related to Mother's unresolved domestic violence issues. Despite the prior domestic violence incident, Mother refused to provide contact information for Jimmy A. to CYFD. She admitted that since the prior domestic violence incident, Jimmy A. went back and forth from her home and some other unknown place but nonetheless, Mother claimed not to know his address or phone number. Mother did not seek a restraining order despite Trujillo's advice.

**{8}** CYFD presented evidence that Mother neglected Child's medical needs. Mother acknowledged that Child had "severe ADHD" and that his behavior had been so poor at "a couple" of daycares that he was "kicked out" and entered a residential treatment program at the Children's Treatment Center. After Child returned from residential treatment to Mother's care, Child had behavioral issues at school which caused the school to evacuate his classroom on three separate occasions. All of these incidents occurred while Child was residing with Mother after his discharge from residential treatment in late September 2018. Child took ADHD medication while in residential treatment, and during that time he had no major behavioral incidents at school. After Child was discharged from residential treatment, Mother did not immediately fill Child's

prescription for ADHD medication. She admitted that she allowed a lapse in medication, but said it lasted only "a couple of days." However, Child's principal testified that when Child returned from residential treatment to Mother's custody, it was "obvious" to her, based on Child's behavior, that he was no longer on his medication.

**{9}** Finally, CYFD presented evidence that Mother neglected Child's educational needs. The evidence showed Child was either tardy or absent seventy-two percent of the thirty-six days of school he was residing with Mother. In an attempt to address Child's behavioral and attendance issues, Child's principal had several discussions with Mother. Although Mother agreed to remedy Child's poor attendance during discussions with Child's principal, his attendance did not improve.

**{10}** The district court rejected CYFD's contention that Mother abused child. However, the district court concluded that Mother neglected Child by failing to (1) meet his educational needs and ensure that he attended school; (2) meet his medical needs and ensure he took his medications as required; (3) maintain a safe and stable home for him; and (4) protect him from the violence and domestic abuse of Jimmy A. This appeal followed.

## DISCUSSION

**{11}** Mother raises two arguments on appeal. She claims (1) the district court's determination that Child was neglected is not supported by substantial evidence, and (2) the district court erred by refusing to allow her counsel to use certain photographs during the cross-examination of a witness. We address each in turn.

### I. Substantial Evidence of a Clear and Convincing Nature Supports the District Court's Finding of Neglect

**{12}** On appeal "we must determine whether the district court's decision is supported by substantial evidence of a clear and convincing nature." *State ex rel. Children, Youth & Families Dep't v. Alfonso M.-E.*, 2016-NMCA-021, ¶ 26, 366 P.3d 282. "Clear and convincing evidence is . . . evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Lance K.*, 2009-NMCA-054, ¶ 16, 146 N.M. 286, 209 P.3d 778 (alteration, internal quotation marks, and citation omitted). "We indulge all reasonable inferences in support of the district court's decision and disregard all inferences or evidence to the contrary." *State ex rel. Children, Youth & Families Dep't v. Cosme V.*, 2009-NMCA-094, ¶ 19, 146 N.M. 809, 215 P.3d 747 (alterations, internal quotation marks, and citation omitted). Our task is not to "reweigh the evidence." *In re Termimation of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 3, 120 N.M. 463, 902 P.2d 1066. Instead, our inquiry is "narrow," and limited to considering "whether, viewing the evidence in the light most favorable to the prevailing party, the fact[-]finder could properly determine that the clear and convincing evidence standard was met." *Id.*

**{13}**   The Children's Code defines "neglected child," in pertinent part, as a child "who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent . . . or the failure or refusal of the parent . . . when able to do so, to provide them[.]" Section 32A-4-2(G)(2). To find neglect, the district court must conclude that there is clear and convincing evidence of the parent's "culpability through intentional or negligent disregard of [the child's] well-being and proper needs." *State ex rel. Children, Youth & Families Dep't v. Michelle B.*, 2001-NMCA-071, ¶ 17, 130 N.M. 781, 32 P.3d 790. The "culpability requirement operates to exclude cases in which even an exemplary parent could not provide proper parental care and control due to circumstances beyond that parent's control or where a parent is acting reasonably." *State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 28, 137 N.M. 687, 114 P.3d 367 (internal quotation marks and citation omitted).

**{14}**   Mother argues there was not clear and convincing evidence to support the adjudication based on neglect. We disagree. We need not make any specific determination with respect to each finding of neglect by the district court. *See In re Eventyr J.*, 1995-NMCA-087, ¶ 14 (affirming a district court's finding of neglect based on the combined effect of multiple failures to provide appropriate parental care and control). Instead, we conclude that the combined effect of Mother's failures supports the district court's finding of neglect by clear and convincing evidence.

**{15}**   We begin by reviewing the district court's finding that Mother failed to meet Child's medical needs. Despite Mother's acknowledgment that Child's ADHD was severe, after Child was discharged from residential treatment, Mother did not immediately fill Child's prescription for ADHD medication. She admitted that she allowed a lapse in medication, but said it lasted only "a couple of days." However, there was circumstantial evidence that the lapse was longer or that Child needed to have his medication reevaluated. Child's principal testified that when Child returned from residential treatment to Mother's custody, it was "obvious" to her that he was no longer on his medication. He would come to school in a heightened state, and displayed inappropriate and impulsive physical and verbal behavior. "[W]e have long recognized that clear and convincing evidence may be circumstantial in nature." *Chavez v. Manville Prods. Corp.*, 1989-NMSC-050, ¶ 20, 108 N.M. 643, 777 P.2d 371. Here, the evidence shows that Child had been taking medication for his ADHD while in residential treatment, and that during that time he had no major behavioral incidents at school. However, when he was released from residential treatment into Mother's care, his behavior at school changed abruptly and significantly for the worse. The principal's testimony and the evidence of Child's contrasting behavior between the time he was at residential treatment and the time he was residing with Mother leads to a reasonable inference that Child's medication issues were more significant than Mother admitted and "the duty to weigh the credibility of witnesses and to resolve conflicts in the evidence lies with the trial court, not the appellate court." *Chapman v. Varela*, 2009-NMSC-041, ¶ 5, 146 N.M. 680, 213 P.3d 1109 (alteration, internal quotation marks, and citation omitted). Our task is not to "reweigh the evidence" because the district court is "better position[ed] to assess the live testimony than we are." *In re Eventyr J.*, 1995-NMCA-

087, ¶ 3. In this case, we decline to reweigh the evidence, and accordingly conclude that the district court's finding that Mother failed to meet Child's medical needs supports the ultimate determination of neglect.

**{16}**     The district court's finding of neglect is further supported by evidence that Mother failed to meet Child's educational needs. CYFD presented evidence that Child was either tardy or absent seventy-two percent of the time during the thirty-six days of school he was residing with Mother. Child's teacher estimated that Child was absent one-third of the days he was residing with Mother. It is axiomatic that failure to ensure a child regularly attends school will negatively impact them, and in this case, that is exactly what happened. As the district court noted, "twelve absences and fifteen tardies in a semester is not acceptable." Child's attendance issues negatively impacted his test scores, socialization with classmates, and academic work. We note that the "culpability requirement" in our abuse and neglect jurisprudence "operates to exclude cases in which even an exemplary parent could not provide proper parental care and control due to circumstances beyond that parent's control or where a parent is acting reasonably." *Shawna C.*, 2005-NMCA-066, ¶ 28 (internal quotation marks and citation omitted). However, Mother failed to demonstrate that Child's attendance issues resulted from circumstances beyond her control. In an attempt to address Child's behavioral and attendance issues, Child's principal had several discussions with Mother. Mother agreed to remedy Child's poor attendance during discussions with Child's principal, but his attendance did not improve. Mother's only excuse was that their home was far away from Child's school and that they had transportation issues. Mother told CYFD she did not have a plan to address Child's behaviors other than trying to get him enrolled in therapy, and she provided no plan to address his absences or tardiness.

**{17}**     The district court's finding that Mother failed to maintain a safe and stable home for Child further supports the district court's determination of neglect. During Trujillo's visit following the domestic violence incident, Trujillo testified that she was concerned about the cleanliness and condition of both the inside and outside of Mother's home. Trujillo explained to Mother the importance of cleaning the home and yard and Mother agreed to do so. Despite the warning and Mother's agreement, the condition of Mother's home did not improve.[1] Instead, when Cleveland visited the home the night the children were taken into CYFD custody, the conditions in and around the home were significantly worse. As the district court noted, it "was more than dirty." Every room contained piles of clothing, trash, and debris, many rooms contained cockroaches, and the home was difficult to move through, which would have made ingress and egress difficult during an emergency. In addition to the obstructed and unsanitary conditions, the home presented other safety hazards outside of the house, including several vehicles, piles of tools, metal car parts, dining room had exposed electrical sockets, and a sharp steak knife on the edge of the table within reach of the children. The district court focused not only

---

1There was also evidence that Child was consistently dirty, and on some occasions Child's teacher reported that his hands and arms were often "filthy." On at least one occasion, Mother brought Child to school on a motorcycle, and Child was not wearing a helmet. When Trujillo removed Child and his sister from the home, she testified they smelled bad and likely had not bathed for some time. She said their clothes were stained and spotted, and their shoes were tattered.

upon the existence of the hazards, but Mother's failure to address them, and "she was told she needed to clean it up and a couple of months later it was worse." Mother also abdicated her responsibility to make the home safe. During the family-centered meeting following CYFD's removal of the children from the home, Mother acknowledged that the home was not "as clean as it should be" but said that cleaning the yard was Jimmy A.'s responsibility because the cars were his. We agree that the squalid and unsafe conditions of the home and Mother's failure to remedy these conditions further supports the district court's finding of neglect.

{18}    Finally, the district court's finding that Mother failed to protect Child from domestic abuse also supports its determination of neglect. We have previously held that "[e]vidence of past domestic violence can be relevant in an action for neglect when the abused parent fails to recognize the harm the violence causes the children or refuses to get help in ending the situation." *In re Guardianship of Ashleigh R.*, 2002-NMCA-103, ¶ 21, 132 N.M. 772, 55 P.3d 984. We acknowledge that the uncontroverted evidence was that Child was not present at Mother's home—and was not even residing there—when Jimmy A. attacked her. However, even after Mother accused Jimmy A. of choking and hitting her, Jimmy A. continued to visit Mother's residence whenever he pleased, Mother refused to provide contact information for Jimmy A. and did not take any steps to prevent Jimmy A. from being present when Child was at home. Despite alleging Jimmy A. choked and hit her, and evidence that Mother had had previous domestic violence incidents in the past with Jimmy A. and with other people, Mother failed to take any steps to address the threat the incidents of domestic violence posed to Child. Mother did not seek a restraining order despite Trujillo's advice, nor did she take any other action to exclude him from her home or from contact with Child. In addition, she prevented CYFD from taking any action by repeatedly declining to provide contact information for Jimmy A. Mother's refusal to take *any* action to protect herself and her children from Jimmy A., when viewed in light of their history of domestic violence, further supports the district court's adjudication of neglect.

{19}    The district court made it clear that its adjudication of neglect was not based upon any one of Mother's failures, but rather upon their combined effect. We agree with this approach. To find neglect, the district court need only conclude that there is clear and convincing evidence of the parent's "culpability through intentional or negligent disregard of [the child]'s well-being and proper needs." *Michelle B.*, 2001-NMCA-071, ¶ 17. We must "indulge all reasonable inferences in support of the district court's decision and disregard all inferences or evidence to the contrary." *Cosme V.*, 2009-NMCA-094, ¶ 19 (alteration, internal quotation marks, and citation omitted). Based on the testimony presented, we conclude a reasonable fact-finder could find by clear and convincing evidence that Mother, because of her faults or habits, or her failure or refusal when able to do otherwise, did not provide the care or control necessary for Child's well-being.

## II.    Response to Dissent

{20}    We respectfully disagree with the dissent's position that we should reverse the district court's finding of neglect. The dissent asserts that New Mexico does not have a

clear standard for neglect under Section 32A-4-2(G)(2), and then argues that the adjudication of neglect in this case is not supported by clear and convincing evidence. Dissent Op. ¶¶ 29, 43. There are two primary problems with this approach. First, Mother did not bring an appeal asserting the neglect statute is vague, ambiguous, or unconstitutional, and the dissent's proposal to address and decide this case based upon these unraised issues is improper. The dissent points out the "well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions" *Lovelace Med. Ctr. v. Mendez*, 1991-NMSC-002, ¶ 12, 111 N.M. 336, 805 P.2d 603, but then proceeds to hang its hat upon a constitutional vagueness argument that was not raised by the litigants. Dissent Op. ¶ 38.[2] Such a sua sponte approach violates clear guidance from our Supreme Court directing that an appellate court should not reach issues that the parties have failed to raise in their briefs. *See State ex rel. Human Servs. Dep't v. Staples*, 1982-NMSC-099, ¶¶ 3, 5, 98 N.M. 540, 650 P.2d 824 (stating that "courts risk overlooking important facts or legal considerations when they take it upon themselves to raise, argue, and decide legal questions overlooked by the lawyers who tailor the case to fit within their legal theories." (alteration, internal quotation marks, and citation omitted)).

**{21}**     Second, even if this Court were to exercise its discretion to reach the unraised constitutional and statutory interpretation issues, we are not convinced that the statutory scheme is ambiguous, and to hold otherwise would run contrary to our established precedent proclaiming the opposite. In *Shawna C.*, this Court rejected a similar "void for vagueness" argument directed at the Abuse and Neglect Act (the Act) in which a parent argued that the phrases "without proper parental care because of the faults or habits of the child's parent" and "at risk of suffering serious harm," when read together, fail to give parents notice of what conduct is prohibited and vest "entirely too much discretion in CYFD and the district court in determinations of parental unfitness." 2005-NMCA-066, ¶ 31 (omission, internal quotation marks, and citations omitted). We held that these phrases "provide adequate standards to guide CYFD in its enforcement activities and do not invite or encourage arbitrary enforcement." *Id.* ¶ 39. We noted "that the focus should be on the acts or omissions of the parents in their caretaking function[,]" *id.* ¶ 30, and concluded that "[t]he Act's language is broad enough to cover the myriad harms that may confront children, but not so broad and standardless to give CYFD carte blanche to file petitions against any parent it chooses." *Id.* ¶ 39.[3] The statute defines a "neglected child" as one

---

2The dissent further speculates on other matters that are not before this Court, noting that a determination of neglect can lead to termination of parental rights. Dissent Op. ¶ 29. While this is a true statement, invoking it in this case oversteps the bounds of the appeal which does not involve the termination of Mother's parental rights. Similarly, the dissent asserts that "a risk of harm also exists when a child is removed from the family home based on an erroneous determination that the child was neglected because a child faces potential dangers in state care." Dissent Op. ¶ 29 (citation omitted). There are no allegations or evidence in this case suggesting Child was or would be harmed by removal from the home. Cases ought to be decided on the grounds actually raised by appeal, and an appellate court should refrain from injecting hypotheticals unsupported by facts or argument into its legal opinions. 3To the extent the Legislature wishes to clarify or modify the Act, it is free to do so. *See State v. Greenwood*, 2012-NMCA-017, ¶ 38, 271 P.3d 753 ("The Legislature knows how to include language in a

who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent, guardian or custodian or the failure or refusal of the parent, guardian or custodian, when able to do so, to provide them[.]

Section 32A-4-2(G)(2). We agree with the dissent that it is not enough that the child lacks "proper" parenting. *See id.*; Dissent Op. ¶ 35. The impact of the improper parenting must amount to a "failure or refusal" to provide care or control "necessary for the child's well-being." Section 32A-4-2(G)(2). In this case however, it is clear that through failure or refusal, Mother left Child without proper parental care and control with respect to Child's medical needs, school attendance, the cleanliness and sanitation of his surroundings at home, and his safety. The dissent makes much of the fact that our precedent and the statutory text itself impose a culpability requirement, which precludes a finding of neglect if the parent "act[ed] reasonably" or if even an "exemplary parent" could not have provided "proper parental care and control." Dissent Op. ¶ 35 (quoting *Shawna C.*, 2005-NMCA-066, ¶ 28). The dissent speculates whether Mother's transportation issues were beyond her control or whether obtaining a restraining order against Jimmy A. could have led to an increased risk of domestic violence. Dissent Op. ¶ 45 n.6. The problem with such speculation is that it is not backed by any facts in the record and ignores the directive that we "indulge all reasonable inferences in support of the district court's decision and disregard all inferences or evidence to the contrary." *Cosme V.*, 2009-NMCA-094, ¶ 19 (alteration, internal quotation marks, and citation omitted). There is no indication that Mother took reasonable steps to address her alleged transportation issues, and she made no attempt whatsoever to prevent Jimmy A. from accessing her home or her children. The dissent further argues that CYFD's evidence is either too generalized or too sparse to prove neglect. Over focusing on the individual threats of harm ignores the totality of circumstances and the case law permitting us to aggregate the evidence when coming to a determination regarding neglect. *See In re Eventyr J.*, 1995-NMCA-087, ¶¶ 14-24. "[V]iewing the evidence in the light most favorable to the prevailing party, the fact[-]finder could properly determine that the clear and convincing evidence standard was met." *Id.* ¶ 3. We need not address the dissent's alternative analytical framework (which is based upon draft standards and out-of-state case law not adopted by this Court or our Legislature, and not raised in this case at any point). We affirm the district court's determination that Child was neglected.

---

statute if it so desires." (alteration, internal quotation marks, and citation omitted)). However "if the meaning of a statute is truly clear—not vague, uncertain, ambiguous, or otherwise doubtful—it is of course the responsibility of the judiciary to apply the statute as written and not to second-guess the [L]egislature's selection from among competing policies or adoption of one of perhaps several ways of effectuating a particular legislative objective." *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 22, 117 N.M. 346, 871 P.2d 1352. For a court to rewrite the law as the dissent invites, would violate the separation of powers codified in our Constitution. *See* N.M. Const. art. III, § 1 ("The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted.").

### III. The District Court Did Not Abuse Its Discretion in Prohibiting Mother From Introducing Photographic Evidence

**{22}** Mother contends the district court abused its discretion in ruling that Mother could not impeach Trujillo with photographs of Mother's home. We review admission or exclusion of evidence by a district court under an abuse of discretion standard. *See In re Augustine R.*, 1998-NMCA-139, ¶ 11, 126 N.M. 122, 967 P.2d 462. Pursuant to Rule 10-332(A) NMRA, Mother was required to disclose any evidence including "photographs" "in [her] possession, custody or control . . . which [Mother] intend[ed] to introduce in evidence at the adjudicatory hearing . . . or which were prepared by a witness whom [Mother] intend[ed] to call[.]" For failure to comply with this rule, a court may prohibit the party from introducing the undisclosed material as evidence. *See* Rule 10-332(E) (referencing Rule 10-137(B) NMRA and providing that a court may "prohibit the party from calling a witness not disclosed, or from introducing in evidence the material not disclosed"). Mother claims that the court acted sua sponte and that CYFD failed to object; however the record reflects that both the guardian ad litem and CYFD did in fact object to the photographs.

**{23}** Mother cites to criminal case law in arguing that a showing of prejudice must be made before a court may prohibit a party from introducing evidence. This is not a criminal case, however, and the plain language of the applicable Children's Court rules do not require a showing of prejudice for the evidence to be excluded. Mother does not develop an argument as to why we should follow criminal case law and "[t]his Court has no duty to review an argument that is not adequately developed." *Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701. For the foregoing reasons, we decline to conclude that the district court abused its discretion in prohibiting Mother from impeaching Trujillo using the photographs.

### CONCLUSION

**{24}** We affirm.

**{25} IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Judge**

**I CONCUR:**

**KRISTINA BOGARDUS, Judge**

**ZACHARY A. IVES (dissenting).**

**IVES, Judge (dissenting).**

**{26}** This case presents an issue of profound importance not just for Mother and Child but for families throughout our state: What is the legal standard for determining whether

a parent has neglected a child under Section 32A-4-2(G)(2)? I believe we should answer that question clearly to provide much-needed guidance to parents, CYFD, and our courts. Parents need guidance about the type of conduct that could result in the state-mandated removal of their children from their homes and even the permanent dissolution of their families. CYFD needs guidance so that it can correctly make life-changing decisions about how to enforce our neglect statute. *See generally In re Adoption of J.J.B.*, 1995-NMSC-026, ¶ 38, 119 N.M. 638, 894 P.2d 994 (explaining that if a court finds neglect "no separate showing or finding by the court with reference to unfitness is necessary" to terminate parental rights). And New Mexico's trial and appellate courts need guidance so that members of the judiciary can fulfill our duty to render reasoned decisions setting out when the law justifies depriving parents of their "fundamental liberty interest in the care and custody of their children." *In re Esther V.*, 2011-NMSC-005, ¶ 37, 149 N.M. 315, 248 P.3d 863.

**{27}** The majority's opinion fails to provide the necessary guidance. Instead of identifying a clear legal standard and applying that standard to the evidence in Mother's case, the majority follows a path that in my view has been taken far too often in our case law: a conclusory know-it-when-we-see-it approach that leaves the reader guessing at the significance of various facts cited in support of the majority's conclusion. By taking this highly subjective ad hoc approach, the majority encourages CYFD and our courts to do the same in future cases. This exposes families to far too great a danger that their futures will hinge on happenstance—that the outcomes of their cases will depend on the individual life experiences, perspectives, opinions, and conscious and unconscious biases the assigned CYFD and judicial decision-makers happen to have. That danger is especially great for families who are part of marginalized communities because termination of parental rights proceedings "are often vulnerable to judgments based on cultural or class bias." *Santosky v. Kramer*, 455 U.S. 745, 763 (1982).

**{28}** New Mexico's families deserve more from the system they depend on to deliver justice. They deserve a principled, consistent approach to matters as important as these. But such an approach is only possible with a clear legal standard. Because the majority has not articulated any such standard, and because I believe CYFD failed to present clear and convincing evidence that Mother neglected Child, I respectfully dissent.

### I. New Mexico Needs But Does Not Have a Clear Standard for Child Neglect Under Section 32A-4-2(G)(2)

**{29}** The stakes in child neglect cases are extremely high—among the highest in our legal system. Erroneous determinations have enormous ramifications. *See Santosky*, 455 U.S. at 787 (Rehnquist, J., dissenting) (observing that "[f]ew consequences of judicial action are so grave as the severance of natural family ties" and that even people who have been convicted of a crime and imprisoned "retain[] the love and support of family members"). Erroneously determining that a parent has neglected a child can lead to a grave injustice: the unwarranted permanent termination of the parent-child

relationship, which can be devastating to children as well as parents. *See, e.g.*, *Santosky*, 455 U.S. at 760 n.11 (recognizing that the consequences for a child "may well be far-reaching" and that a child may lose "the right of support and maintenance, for which he may thereafter be dependent upon society; the right to inherit; and all other rights inherent in the legal parent-child relationship, not just for a limited period . . . but forever." (alteration, internal quotation marks, and citation omitted)). Erroneous determinations can also lead to grave danger. A child may be at risk of harm if the child is left in a parent's custody based on an erroneous determination that the child was not neglected. But a risk of harm also exists when a child is removed from the family home based on an erroneous determination that the child was neglected because a "child faces potential dangers in state care."[4] *Restatement of Children and the Law*, pt. 1, ch. 3, intro. note (Am. Law Inst., Tentative Draft No. 1, 2018) (hereinafter *First Restatement Draft*). Avoiding errors is essential for children, parents, and society. *See Santosky*, 455 U.S. at 761 (recognizing that parents and children share an interest in reducing errors); *id.* at 764 (recognizing that "the social cost of even occasional error is sizable"); *cf. In re Adoption of J.J.B.*, 1995-NMSC-026, ¶ 42 (recognizing that proceedings involving the termination of parental rights "certainly demand a greater degree of factual certainty than ordinary civil proceedings").

**{30}** The law seeks to reduce the risk of error in part through various procedural requirements. When the question of neglect is disputed, the law requires that a neglect determination occur only after a hearing during which evidence and argument are presented by CYFD, a guardian ad litem for the child, and a parent assisted by a lawyer, and a parent has a right to appeal an adjudication of neglect. NMSA 1978, § 32A-4-10 (2005); NMSA 1978, § 32A-4-20 (2014). The law also requires proof of neglect by clear and convincing evidence, rather than preponderance of the evidence. *Santosky*, 455 U.S. at 769; *see* § 32A-4-20(H).

**{31}** These procedural protections, though essential, are of limited value if the substantive law is murky—if we lack a clear legal standard for what amounts to neglect under Section 32A-4-2(G)(2). Only when the governing substantive standard is clearly articulated can we answer the question "Clear and convincing evidence of what?" and thereby ensure that that standard of proof has both "practical and symbolic consequences." *Santosky*, 455 U.S. at 764. Procedural requirements alone will suffice in only the most straightforward cases, those in which the facts leave no doubt about whether the child is neglected. For more challenging cases, we need procedure plus substance. We need a clear substantive standard to consistently analyze and correctly resolve cases in which the parenting is subpar but might not be problematic enough to justify the state taking children from their parents and forever severing their relationships. For cases in this grey area, we must have a legal standard that allows CYFD and our courts to make principled determinations about what amounts to neglect

---

4I rely on the tentative drafts of the *Restatement of Children and the Law*, because I find them compelling. I recognize that the drafts will not reflect the position of the American Law Institute unless the Institute adopts them.

and what does not, thereby minimizing the risk that outcomes will be driven by the decision-makers' individual life experiences, perspectives, opinions, and biases.

**{32}** The absence of such a legal standard is apparent from the majority's opinion, which consists almost entirely of descriptions of the facts of this case and includes hardly any analysis of the legal import of those facts. The decision does not compare the facts of the present case with the facts of any precedents. The majority opinion does not cite a single analogous precedent pertaining to any of the topics at issue in this case: medical care, education, household condition, and exposure to domestic violence. This omission is unsurprising. I am unaware of any decision by our Supreme Court or this Court that affirms an adjudication of neglect on similar facts or that sets the bar for an adjudication of neglect as low as the majority opinion does here. At the same time, I acknowledge that I am unaware of any precedent that reverses an adjudication of neglect on analogous facts.

**{33}** The dearth of comparable cases would not be troubling here if the majority's opinion included a meaningful analysis of how the neglect statute at issue, Section 32A-4-2(G)(2), applies to the facts of this appeal. But it does not. The majority opinion instead quotes the language of Section 32A-4-2(G)(2) and purports to apply it without explaining what that language means. Presented with no reasoned and persuasive attempt to grapple with what I believe to be difficult problems in applying the statute to the facts of this case, I cannot embrace the majority's approach, even as a line drawn in the sand of a non-precedential opinion.

**{34}** The law set forth in the majority's opinion does not address two key questions. First, to the extent that a theory of neglect in this case is that Mother's deficient parenting exposed Child to a risk of potential harm, what degree of risk suffices? Second, what magnitude of actual or potential harm suffices? These gaps in the majority's opinion correspond to gaps in New Mexico law. I will now discuss these gaps and explain how I would interpret Section 32A-4-2(G)(2) to fill them.

**II.     Neither the Language of Section 32A-4-2(G)(2) nor Precedent Provides a Standard Adequately Clear to Apply to the Facts of This Case, but Persuasive Authority Offers a Solution That is Consistent With the Statutory Text, Policy, and Background Principles of Constitutional Law**

**{35}** The statute's plain language describes elements that are familiar at an abstract level: a breach of duty that causes an outcome. The statute defines a "neglected child" as one

> who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent, guardian or custodian or the failure or refusal of the parent, guardian or custodian, when able to do so, to provide them[.]

Section 32A-4-2(G)(2). The Legislature indicated that breach of duty is an element by using the phrases "faults or habits" and "failure or refusal . . . when able to do so." *Id.* Our precedent recognizes that these phrases impose a culpability requirement, which precludes a finding of neglect if the parent "act[ed] reasonably"[5] or if even an "exemplary parent" could not have provided "proper parental care and control." *Shawna C.*, 2005-NMCA-066, ¶ 28 (internal quotation marks and citation omitted). The next element of neglect, causation, is derived from the statutory phrase "because of." Section 32A-4-2(G)(2). The statute also describes the outcome element: the child is "without *proper* parental care and control or subsistence, education, medical or other care or control *necessary for the child's well-being.*" Section 32A-4-2(G)(2) (emphases added). By using the emphasized words, the Legislature imposed limitations, confirming what common sense dictates: not all subpar parenting supports a determination that a child is "neglected." It is not enough that the child lacks "proper" parenting. *See id.* The impact of the improper parenting must rise to a certain level; what the parent improperly "fail[s] or refus[es]" to provide must be "necessary for the child's well-being." *See id.* The meaning of this limiting language is at the heart of this appeal. To decide whether affirmance or reversal is the correct result, it is necessary to determine whether there is substantial evidence that the deficiencies in Mother's parenting produced an outcome that is problematic enough to serve as a predicate for terminating her relationship with her son.

**{36}** Because the Legislature did not define "necessary" and "well-being," my search for the meanings of those terms begins with dictionary definitions, *State v. Lindsey*, 2017-NMCA-048, ¶ 14, 396 P.3d 199, and our precedent, but unfortunately cannot end there because the result is a standard that is too vague to be of much use. The most pertinent dictionary definitions of "necessary" are "absolutely needed" *Necessary*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/necessary (last visited June 15, 2021) and "needed in order to achieve a particular result[,]" *Necessary*, *Cambridge Online Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/necessary (last visited June 15, 2021). The particular result identified in our statute is "the child's well-being," and various dictionaries define "well-being" using substantially similar language, best summed up for our purposes as a state of being healthy or, in a word, welfare. *Well-Being, Cambridge Online Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/well-being (last visited June 15, 2021) (defining "well-being" as "the state of feeling healthy and happy" and identifying "welfare" as a synonym); *Well-Being, Merriam-Webster*, https://www.merriam-webster.com/dictionary/well-being (last visited June 15, 2021) (defining "well-being as "the state of being happy, healthy, or prosperous" and identifying "welfare" as a synonym). These definitions raise a fundamental question that our precedent answers: Since a child is neglected only when the child "is without" something needed for that

---

[5]Our Supreme Court has not addressed what amounts to a breach, but the precedents of this Court seem to assume—without analysis of the statutory language or any other indicia of legislative intent—that the standard is an objective one and that ordinary civil negligence, a failure to act reasonably, suffices. *See Shawna C.*, 2005-NMCA-066, ¶ 28 (explaining that a parent who "is acting reasonably" is not culpable); *Michelle B.*, 2001-NMCA-071, ¶ 17 (suggesting that breach involves "intentional *or negligent* disregard of [the child's] well-being and proper needs" (emphasis added)).

child's welfare, is proof of *actual* harm to the child's welfare or health necessary to satisfy the outcome element? No, a risk of harm may suffice, *Shawna C.*, 2005-NMCA-066, ¶ 26, although "a vague inference of future harm" will not. *Id.* ¶ 22

**{37}** Adding the concepts from our precedent to the language of Section 32A-4-2(G)(2) produces a standard that is clearer, but still inadequate. Based on my understanding of extant New Mexico law, a child is neglected if the parent (1) culpably, meaning at least negligently (2) caused (3) the child to be deprived of the care, custody, control, education, or medical attention needed to prevent either actual harm to the child's welfare or health or a risk of such harm that is something more than a vague inference. This standard falls short because it fails to answer the two critical questions I identified above. What magnitude of actual or potential harm suffices? And if the theory is that the parent created an unacceptable risk of potential harm, what degree of risk is unacceptable? Unfortunately, the answers to these questions are nowhere to be found in our statute or our precedent.

**{38}** Because neither the Legislature nor our appellate courts have answered these questions, I believe this court has a duty to do so in this appeal. That duty flows in part from the "well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions." *Lovelace Med. Ctr. v. Mendez*, 1991-NMSC-002, ¶ 12, 111 N.M. 336, 805 P.2d 603. The constitutional question to avoid here is whether Section 32A-4-2(G)(2) is so vague that applying it to Mother would violate her right to due process of law. Given the statute's unclear language and the absence of precedent applying the statute on similar facts, I think there is a legitimate question about whether Mother was adequately put on notice that her conduct fell within the statute's scope. Avoiding that constitutional question entails looking beyond the plain meaning of the statutory text and the limited interpretation in our precedents, which produce a neglect standard that arguably does not meet the constitutional demand for clarity in all but the easiest cases—those in which "persons of common intelligence . . . would [not] differ in [the statute']s application." *Bishop v. Evangelical Good Samaritan Soc'y*, 2009-NMSC-036, ¶ 20, 146 N.M. 473, 212 P.3d 361. In my view, this case is far from easy. And without further interpretation, Section 32A-4-2(G)(2) could present the very threats that the void-for-vagueness doctrine is designed to thwart, not just here, but in future cases: failing to give parents "fair warning" about what the statute prohibits and allowing CYFD and our courts to engage in "arbitrary and discriminatory" decision-making. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *accord Old Abe Co. v. N.M. Mining Comm'n*, 1995-NMCA-134, ¶ 24, 121 N.M. 83, 908 P.2d 776 (discussing the vagueness standard of review set forth in *Grayned* in a civil context). To avoid the due process question, it is necessary to clarify the neglect standard using accepted tools of statutory construction.

**{39}** These tools are designed to help us discover the legislative intent behind the statute and to effectuate that intent. *Chatterjee v. King*, 2012-NMSC-019, ¶ 11, 280 P.3d 283. Because Section 32A-4-2(G)(2) is unclear, it is appropriate to consider the policy implications of potential constructions. *State v. Smith*, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022. When considering the policy implications, it is important not to

lose sight of the fact that Section 32A-4-2(G)(2) is part of the Children's Code, which is a "comprehensive legislative scheme[,]" *Smith*, 2004-NMSC-032, ¶ 10, and that one of the purposes of that scheme is the "preserv[ation of] family unity whenever possible." *State ex rel. Children, Youth & Families Dep't v. Djamila B.*, 2015-NMSC-003, ¶¶ 26-27, 342 P.3d 698. To achieve that purpose, the standard for neglect must reflect an appropriate balancing of various interests. These include New Mexico's powerful interest in protecting the well-being of its children. *See generally Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). But that interest does not always weigh in favor of intruding on the parent-child relationship; sometimes a child's well-being is best protected by not intruding. Under the Children's Code, "[a] child's health and safety shall be the paramount concern," NMSA 1978, § 32A-1-3(A) (2009), but absent a threat to a child's health or safety, "children are usually better off when the state supports the parent–child relationship and allows parents substantial freedom to raise their children according to their own values and preferences." *Restatement of Children and the Law*, ch. 1, intro. note. Even when the family home is not perfect, "permanent removal from that home will not necessarily improve [the child's] welfare." *Santosky*, 455 U.S. at 765 n.15. Unless a parent's shortcomings actually demonstrate that the parent is unfit to raise the parent's own child, the parent's "desire for and right to the companionship, care, custody, and management of [the parent's] children"—a "fundamental liberty interest" that is "far more precious than any property right"—must prevail. *Id.* at 758-59 (internal quotation marks and citations omitted). An interpretation of the Act that permits an adjudication of neglect absent a true threat to a child's welfare risks unwarranted destruction of families and unjustified encroachment on the liberty of parents to raise their children as they see fit.

**{40}** Distilling these fundamental principles into an appropriate and workable legal standard is not a simple task, but I need not start from scratch. The American Law Institute has published tentative draft standards based on a thoughtful balancing of these interests, and those standards clearly answer the two key questions that the text of our statute and precedent do not squarely address. In the context of physical neglect, the Restatement's standard requires proof that the child "suffer[ed] *serious* physical harm or [wa]s exposed to a *substantial risk* of serious physical harm." *Restatement of Children and the Law: Children in Families* § 2.24(b) (Am. Law Inst., Tentative Draft No. 2, 2019) (emphases added). The bar for medical neglect is set at a similar height: "serious harm or a substantial risk of serious harm to the child's physical or mental health." *First Restatement Draft* § 3.26.

**{41}** The introductory notes to these draft standards reveal that the drafters weighed "the state's interest in protecting the health and well-being of children and in promoting their development into productive self-sufficient adults" and the "contemporary rationale for strong parental rights." *See id.* ch. 1, intro. note (Am. Law Inst., Tentative Draft No. 1, 2018); *accord id.* ch. 3, intro. note (Am. Law Inst., Tentative Draft No. 1, 2018). This parental rights rationale has several components, including the constitutional considerations summarized above and the need to afford significant deference to parental authority "to preserv[e] the parent-child relationship" because "children are usually better off when the state . . . allows parents substantial freedom to raise their

children according to their own values and preferences." *Id.* ch. 1, intro. note (Am. Law Inst., Tentative Draft No. 1, 2018). The legal protection of parental authority also reflects "our societal commitment to respecting diversity among families and restricting state intervention that may be grounded in racial, cultural, or class bias." *Id.* The note explains that "[p]arents living in poverty or in minority racial, ethnic, and religious communities may adopt child-rearing approaches that differ from mainstream practices and values but that do not pose a *substantial risk of serious harm* to their children." *Id.* (emphasis added). By placing clear and meaningful limits on what constitutes neglect and therefore on the state's ability to intervene, the standards in the draft Restatement provisions aim to "preserve[] the privacy of all families from unwarranted intrusion." *Id.*; *see also id.* ch. 3, intro. note ("[T]he [state's] authority to intervene is limited to circumstances where the state has established that the care provided by parents poses a serious threat to a child's physical or mental health. Even when a parent's behavior may be suboptimal, state intervention is not authorized absent this heightened level of harm.").

**{42}**   Because I believe those standards and the explanatory notes reflect a careful and thoughtful balancing of the policy and constitutional considerations that must inform an interpretation of our neglect statute, I would fill the gaps in New Mexico's neglect standard by requiring proof that the deficient parenting caused the child to suffer serious harm or exposed the child to a substantial risk of serious harm.

### III.   The Adjudication of Neglect in This Case Is Not Supported by Clear and Convincing Evidence

**{43}**   Applying my understanding of the framework suggested by the Restatement drafts, I conclude that the evidence in this case is insufficient to support the adjudication of neglect. The district court concluded that Mother had failed to provide Child with four specific types of parental care necessary for Child's well-being, but the evidence, even when considered collectively, does not show that Mother's shortcomings in providing for Child's welfare caused a substantial risk of serious harm to Child. None of the four bases for neglect identified by the district court—Mother's ostensible failure to attend to Child's educational needs, to attend to Child's medical needs, to provide Child with a safe and stable home, and to protect Child from domestic abuse—was shown to have created the requisite harm or danger. Although case law allows us to aggregate these four bases to assess whether Child's overall well-being was harmed or threatened, *see In re Eventyr J.*, 1995-NMCA-087, ¶¶ 14-24, the showing here is still lacking.

**{44}**   First, the evidence supporting the district court's determination of educational neglect, while troubling, pertains to too short a period of time to permit me to vote to uphold that determination. The majority asserts, and I agree, that "it is axiomatic that failure to ensure a child regularly attends school" will have a "negative[] impact." Majority Op. ¶ 16. Although Mother's parenting on this score was deficient, I do not think the failure or the impact shown here suffice to prove a substantial risk that Child's educational development would be seriously harmed. Child's absences and tardies were plainly excessive, but I do not think the fact of those absences and tardies alone weighs in favor of a finding of educational neglect. For general guidance on this point, I

look to a statutory scheme within the Children's Code that specifically addresses school attendance. The Family in Need of Court-Ordered Services Act, NMSA 1978, §§ 32A-3B-1 to -22 (1993, as amended through 2019), defines a family in need of court-ordered services as one "whose child, subject to compulsory school attendance, is absent from school without an authorized excuse more than ten days during a school year." Section 32A-3B-2(A). Unlike an adjudication of neglect, a court determination that a child is part of a family in need of court-ordered services does not automatically put parents on the road to permanently losing their parental rights. *See* NMSA 1978, § 32A-4-28(B)(2) (2005) (listing neglect as one basis for termination of parental rights when other requirements are met); § 32A-1-3(C) (mandating that the Children's Code be interpreted and construed to effectuate the legislative purpose of "provid[ing] a continuum of services for children and their families"). I think that the ten-day threshold for determining that a child's family is in need of court-ordered services serves as a useful guidepost in assessing whether a showing of excessive absences alone demonstrates educational neglect, and, because Child's twelve absences here barely exceeded that threshold, I do not think that they suffice.

**{45}** Moreover, I do not think that the evidence of the impact on Child's educational well-being suffices to show that Child suffered serious harm or was at substantial risk of suffering serious harm. Child's absences and tardiness were concentrated in a time period of roughly two-and-a-half months, and the vague testimony presented at the adjudication hearing demonstrates nothing more than that Child's academic performance and socialization declined to some unknown extent within that time frame. There was no evidence that Child was at risk of long-term educational deficits, or that the failure to ensure regular school attendance was a reoccurring shortcoming on Mother's part.[6] In my view, a temporary parental lapse in ensuring regular school attendance, even if it contributes to a child's difficulties in keeping up with day-to-day learning, is insufficient to demonstrate the likelihood or degree of harm necessary to support a finding that a parent has neglected the educational needs of that parent's child.

**{46}** Second, I do not think that the testimony about Child's behavior is evidence that his ADHD was so severe that a failure to treat it with prescribed psychotropic medication supported an adjudication of neglect. For one thing, it seems problematic to use before-and-after comparisons of a child's behavior while on psychotropic medication and while off it as though they provide reliable indicators of a child's psychiatric or medical needs. The causes of behavioral difficulties may be complex, and an analysis that treats *correlation* between a time period in which a child is not taking psychotropic medication and an increase in behavioral problems as though it alone

---

6The majority reasons that the record shows Mother culpably caused Child's attendance problems because "Mother failed to demonstrate that Child's attendance issues resulted from circumstances beyond her control." Majority Op. ¶ 16. Although I assume for purposes of this dissent that the fact of excessive absences can, standing alone, suffice to prove a culpable failure to meet a child's educational needs, I note that CYFD, not Mother, had the burden of proving neglect below. I therefore find it troubling that the majority dismisses as an "excuse" Mother's asserted transportation difficulties, when a parent for various reasons, socioeconomic and not, might have trouble transporting a child to school without being the least bit culpable. Majority Op. ¶ 16.

proves that the two are *causally* related risks overlooking other factors that may be the true source of the problem. Moreover, showing that a parent did not medicate a child to a point where severe behavioral problems cease is a long way from showing that the failure to provide medication is culpable. *Cf.* NMSA 1978, § 32A-4-6(B) (2015) (providing that "[a] child shall not be taken into protective custody solely on the grounds that the child's parent . . . refuses to consent to the administration of a psychotropic medication to the child"). In my view, CYFD can meet its burden only by presenting specific evidence about the severity of a child's condition and the child's treatment history, the medical necessity of and available options for treatment, and the predicted efficacy of those options in alleviating detrimental symptoms that are medically attributable to the condition. Absent such evidence, our assessment necessarily turns on guesswork regarding the link between a child's medical condition and that child's behavioral problems, and on unsupported conjecture about the proper course of parental behavior in a difficult situation. The majority's analysis illustrates the point: it rests entirely on lay opinion testimony giving rise to inferences regarding the causal link between the lapse in medication and Child's behavioral outbursts.

**{47}**    Third, I think the majority assigns undue weight to the evidence underlying the district court's finding that Mother failed to provide Child with a safe and stable home. The majority asserts that "squalid and unsafe" conditions prevailed in Mother's home, but the pertinent evidence, consisting entirely of the testimony of Cleveland,[7] showed

---

[7]The majority prefaces its discussion of Cleveland's testimony with a passing mention of Trujillo's September 2018 visit to the home and the discussion between Mother and Trujillo. I do not agree that these events support the district court's conclusion that Mother failed to provide Child with a safe and stable home. The pertinent testimony, reproduced in full below, fails to demonstrate that the condition of Mother's home is indicative of any sort of deviation from acceptable parenting practices. While Trujillo's discussion with Mother may have put Mother on notice that cleanliness is a consideration pertinent to CYFD's assessment of children's welfare, that does nothing to change the fact that Trujillo was not concerned about the safety of Mother's home at the time. So far as I am aware, parents are permitted to raise their children in conditions that others consider "a little messy," and I am unwilling to treat testimony indicating that a child's home is safe, but disorganized, as though it weighs in favor of upholding a finding of neglect to the slightest degree.

**Pertinent Testimony**

Q:      What concerns did you have for safety of the children at that time?
A:      Just the domestic violence with [Jimmy A.] and her, at the time. The house was a little messy, and I explained to her the importance of cleaning it, she had a friend there that was actually doing the dishes when I was there, and there was like cereal all over the floor, and I said, you know, you need to pick it up—especially because the kids are little, and I know [one of Mother's other children] is only . . . two, so she would be more likely to put stuff in her mouth, so I just made sure that she knew to clean the house, and she agreed.
Q:      How unclean was the house at that time?
A:      I mean, there was like stuff in the front yard, there was cars, but there wasn't like a lot of stuff, there was a few cars, a few car parts, the backyard wasn't really messed up at all, the house was pretty clear, the areas were clear, there was like some, you know, cereal, like, kids dump stuff on the floor all the time. The kitchen was kind of messy, but like I said the friend was there doing the dishes at the time.

        . . . . .
Q:      What insects did you see in the home?
        . . . . .

only that Mother's home was dirty on one particular night.[8] Absent evidence of a substantial risk of harm resulting from a specific threat or "a history or pattern," *Michelle B.*, 2001-NMCA-071, ¶ 20, of similar conditions, I do not think that a snapshot of the state of a child's home prevailing at a particular moment in time supports a finding of parental unfitness. Parents should be permitted to have off days when doing so poses no substantial risk of serious harm to their children. While the condition of Mother's home in November 2018 was far from ideal, an isolated instance of uncleanliness and messiness—even an extreme one—falls far short of demonstrating the ongoing deprivation of adequate living conditions that is in my view necessary to support a finding of neglect by clear and convincing evidence absent evidence of a *specific* risk of harm.

**{48}** Such evidence was lacking in this case. Although the testimony highlighted three specific threats posed by the state of Mother's home, each gives rise to no more than a "vague inference of future harm." *Shawna C.*, 2005-NMCA-066, ¶ 22.[9] To begin with,

---

A:     None, at that time.
Q:     So, what concerns did you have as to the house?
          . . . . .
A:     I really just told her to clean it, I mean, there was no safety hazards, like towards the kids, at that point, I mean, it was messy, but she agreed to clean it, and I gave her that chance to clean it.

8The majority mentions testimony indicating that Child "consistently" went to school "dirty" and that "his hands and arms were often 'filthy.' " *See* Majority Op. ¶ 17 n.1. This testimony, in my view, is too thin a reed to support the inference the majority apparently draws from it—that Mother failed to provide Child with adequate living conditions for an extended time period—and far too vague to provide any real support for a finding of neglect under any other theory.

9In a footnote, the majority highlights testimony indicating that on "at least one occasion, Mother brought Child to school on a motorcycle[ and Child] was not wearing a helmet." Majority Op. ¶ 17 n.1. It is unclear what role, if any, this evidence played in the district court's determination that Mother neglected Child. The district court's order sets forth the four bases for the adjudication of neglect in a conclusory fashion and contains no specific factual findings, and nothing in the district court's remarks at the close of the adjudication hearing, set forth below, indicates that the court found this testimony significant. The majority does not explain how this fact supports the district court's conclusion that Mother failed to provide Child with a safe and stable home or any of the other theories of neglect the district court accepted. And insofar as the majority is affirming on the basis of a new theory not articulated in the district court's order, it fails to explain that theory or its contribution to the majority's ultimate conclusion that sufficient evidence supports the adjudication of neglect.

**District Court's Remarks**

Well, I'm not going to find abuse under [Section 32A-4-2](B)(1) and (B)(4). It's not there. Now, under [Section 32A-4-2](G)(2), which is care and control, I think it is clear, under clear and convincing evidence, that, if you add everything together, that there was neglect, that [Child] was neglected to a certain degree. Now, was it a lot of neglect, was it bad neglect, did Mother do nothing to help him with [Child's] need for medication? No, I don't think that's true. I think [Mother] did a good job in some ways, a very good job with a hard child to deal with . . . . But, if you look at the evidence, the cumulative evidence, and I'm looking at all of it, including some of the things that disturbed me more, that we haven't heard a lot about, but the unresolved domestic violence issue, that I hope has been resolved since then, and is what I think is one of the biggest things to deal with here. Because I think there's a domestic violence situation. I think [Mother] is being abused to a certain degree. And I hope that's something she can work on to help herself and [Child], is that [Jimmy A.] is violent and not making it possible for [Mother] to run her household. Because she's got all of these car parts and . . . so, in some ways, what I'm

although a "sharp" knife was left on the edge of the dining room table, the undisputed evidence showed Child was asleep when Cleveland observed the knife, and nothing in the record indicates that the danger posed by the knife was more than hypothetical. So too with the electrical outlet that was missing an electrical plate: there was no testimony indicating that the outlet was in a location easily accessible to children, much less that Mother's actions or omissions with respect to the care provided or control exercised over Child created a danger that the exposed wires in the outlet would cause Child harm. And the same is true of the cars and tools in the front yard—the common denominator between the conditions observed during the September and November visits—and the piles of clothing and trash throughout the house. Although this clutter may have obstructed movement in a manner which theoretically could have been problematic if Child needed to leave quickly to escape a fire or in some other type of emergency, the evidence did not establish that any such emergency was likely or that egress would have been hampered to any dangerous degree. Because the evidence in this case fails to demonstrate an ongoing pattern of hazardous living conditions or any specific risk posed by the conditions present in November 2018, I think that the testimony regarding Mother's home hardly suffices to move the scales in favor of a finding of neglect at all, and that it therefore adds little to CYFD's efforts to "instantly tilt [them] in the affirmative." *In re Adoption of Doe*, 1984-NMSC-024, ¶ 9, 100 N.M. 764, 676 P.2d 1329 (internal quotation marks and citation omitted).

**{49}** Finally, I disagree with the majority that we can uphold the district court's adjudication of neglect on the basis of Mother's failure to protect Child from the violence and domestic abuse of Jimmy A. CYFD did not present any evidence that Jimmy A. abused Child. Child showed no signs that he had been physically abused, such as

---

doing is finding that she failed to protect [Child] from the situation that [Mother] didn't create necessarily. It could have been dangerous, but I'm not finding abuse there. [Mother] didn't resolve the issue. The thing is that it came up before, [Mother] didn't get a restraining order against [Jimmy A., he was there, he had access to the house and the children, [Jimmy A.] could have been violent at any time, and she couldn't have protected the kids from him. Educational neglect, I am finding that there was some educational neglect, [Mother] got [Child] out of school late or not at all, twelve absences and fifteen tardies in a semester is not acceptable. And it did affect [Child]. The condition of the home, it was more than dirty, it really kind of is a dirty home case. But on the other hand, there's other things involved, like the metal car parts and stuff in the children's bedroom where it doesn't belong, kids could trip and hurt themselves, bang their heads on it, you know; that just shouldn't exist in a kid's bedroom. She was told she needed to clean it up, couple of months later, it was worse. And then there's a conflict in the testimony about medication and behaviors, and when he was on meds and off meds, but it looks like, from the evidence I've heard, [Mother's] explanation of his behaviors doesn't straighten out the problem. It's still concerning to me that there is chaos at home and that it needs to be resolved. I think it can be resolved, and I'm glad that this case exists, because I want the State to do what it can to help [Mother] resolve these issues so that she can get her child back. That's the point. So I'm finding that all of that by clear and convincing evidence, that I have jurisdiction over the parties and subject matter and that [Child]was a neglected child and that it's in the best interests of [Child] [the State maintain custody for a period of up to two years, hopefully it's not a period of any length at all, to allow her to get some help to resolve some of these issues. Any help the State can give [Mother] I would appreciate.

marks or injuries, when CYFD removed him from Mother's home, and, as the majority acknowledges, the uncontroverted evidence was that Child was not present at Mother's home—and was not even residing there—when Jimmy A. attacked her. CYFD's evidence was that even after Mother accused Jimmy A. of choking and hitting her, Jimmy A. continued to have access to Mother's home, and that Mother did not seek a restraining order to prevent Jimmy A. from being present when Child was at home. The question before us is therefore whether CYFD's evidence about domestic violence, viewed in the light most favorable to CYFD, clearly and convincingly demonstrated Mother's "intentional or negligent disregard [for Child's] well-being and proper needs." *Michelle B.*, 2001-NMCA-071, ¶ 17.

{50}   CYFD failed to carry this burden. In the first place, the evidence did not show that Jimmy A.'s continued access to Mother's home posed a substantial risk to Child. While I agree with the majority that past domestic violence may be relevant to showing neglect, I think this is true only insofar as the past domestic violence risked harming the child or indicates a pattern of domestic violence such that a risk of harm to the child is substantially likely to occur in the future. Here, there is no indication that Child was exposed to any acts of violence committed against Mother: Child was residing at the CTC at the time of the September incident, and there is no evidence that Child was even aware that Jimmy A. had been physically abusive toward Mother, let alone that any violence caused Child harm. Because the single act of domestic violence at issue here did not create a risk of harm to Child, it can support a finding of neglect only if it provides an adequate basis for predicting that *future* acts of domestic violence posed a substantial risk of harm to Child. And, on the evidence presented here, that conclusion can be arrived at only by reasoning that (1) because Jimmy A. had abused Mother once[10] outside of the presence of Child, future instances of domestic violence were likely to reoccur; and (2) Child would likely be exposed to or the victim of these future acts of domestic violence. These inferences seem to me too attenuated to be permissible. Given the scant evidence of the likelihood of future harm to Child, I do not agree with the majority that Mother's "refusal to take *any* action to protect herself and her children from Jimmy A." supports the adjudication of neglect. Majority Op. ¶ 18.

{51}   This is so independently of the fact that the majority never indicates what sort of action would have been necessary for Mother to take. I nevertheless briefly discuss the evidence regarding the reasonableness of Mother's actions and specifically address the action that CYFD contended Mother should have taken: obtaining a restraining order. CYFD did not present any evidence about why Mother did not seek a restraining order or about whether seeking a restraining order would have decreased any risk of harm to Child, increased that risk, or had no impact at all. Based on the record before us, it is impossible to determine whether seeking such an order would have been more likely to exacerbate the situation, increasing the risk that Jimmy A. would react violently in a

---

10At the hearing, Trujillo testified that she knew the incident with Jimmy A. "hadn't been the first time that that had happened" and that Mother "had domestic violence in her past with other people[.]" This testimony is not evidence of a pattern of domestic violence giving rise to a substantial risk of future harm because it fails to indicate (1) when this previous domestic violence occurred; (2) its severity and the impact on Child, if any; and (3) whether Jimmy A. was the perpetrator of this domestic violence.

manner that harmed Child. In other words, by not seeking a restraining order or taking some other unspecified action the majority imagines she should have taken, Mother might well have been acting reasonably with respect to Child's safety, not culpably. CYFD bore the burden of proof, but the record is silent on the critical question of whether Mother's inaction was culpable. We should not fill this evidentiary chasm with judicial speculation that Mother's approach was unreasonable under whatever circumstances Mother faced with respect to Jimmy A.—circumstances largely unrevealed by the record—or with the categorical notion that parents who do not seek restraining orders against their abusers are culpable. Although I share the district court's concern about Jimmy A.'s violent attack against Mother, CYFD did not present clear and convincing evidence that Mother intentionally or negligently disregarded Child's safety by not seeking a restraining order.

{52}   Even in the aggregate, the evidence presented below falls short of being clear and convincing evidence that Mother failed to provide Child with proper parental care and control necessary for Child's well-being. The closest CYFD came to meeting this burden was its evidence of Child's school attendance problems, which, although concerning, do not suffice to show neglect given the relatively short period of time involved. The rest of CYFD's evidence is either too generalized—in the case of the conditions of Mother's home—or sparse—in the case of Child's medical needs and the threatened harm of domestic violence—to get CYFD over the line. Accordingly, I conclude that CYFD failed to prove by clear and convincing evidence that Mother's action or inaction seriously harmed Child or exposed Child to a substantial risk of serious harm, and I would reverse the district court's adjudication of neglect.

**ZACHARY A. IVES, Judge**